[No. B197488. Second Dist., Div. Four. Mar. 11, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
SYLVIA TORRES ROLON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

COUNSEL

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EPSTEIN, P. J.**—In the published portion of this opinion, we hold that a parent has a duty to protect his or her young child and may be criminally culpable on an aider and abettor theory for an assault causing death and on an implied malice theory for murder where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense. We hold that the evidence in this case was sufficient to support guilt for the child's death on either theory. In the unpublished portion of this opinion, we hold that the trial court properly refused to instruct the jury on the defense of duress. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Anthony Bill Lopez was the father of six of appellant's seven children, including her one-year-old son Isaac. Although a court order prohibited appellant from allowing Lopez to visit or stay at her apartment, he had stayed there for about a week before the homicide in this case. The court order also

forbade any unmonitored contact between Lopez and appellant's children, and appellant was not permitted to act as the monitor.

On April 19, 2003, a social worker made an unannounced visit to the apartment. Lopez hid in a bedroom closet, and appellant told the social worker that he was not in the home. The social worker did not notice any injuries on Isaac during the visit.

On April 20, 2003, about 6:00 or 7:00 p.m., Lopez immersed Isaac in a tub of water and unspecified chemicals. Lopez then threw him against a wall, in appellant's presence. Isaac had been crying, but stopped after he hit the wall. Lopez went to sleep about midnight that night, while appellant stayed up to watch Isaac.

Appellant described the events that followed during three interviews with police investigators. (At trial, tapes and written transcripts of the interviews were presented to the jury without objection.) About 2:00 a.m. on April 21, Lopez woke to the sound of Isaac crying. Lopez said Isaac might be hungry and asked appellant's son Christian to heat some food for him. Isaac continued to cry after being fed. Lopez punched Isaac in the chest. Appellant told Lopez to leave Isaac alone, and Lopez told her to shut up and not get involved.

Appellant's neighbor Kristal Cardenas shared a wall with appellant. In the early morning hours of April 21, she heard a screaming child in appellant's apartment and a series of thumps against the wall that lasted for three minutes. The thumps and the screams ceased simultaneously.

About 6:00 a.m. that morning, Lopez said he would take care of Isaac and told appellant to go to bed, which she did. Isaac was strapped into a car seat at that point. An hour later, Lopez woke appellant and told her Isaac was not breathing. She got up and saw Lopez administering cardiopulmonary resuscitation to Isaac, who was lying on a towel. Lopez told her he had wrapped a stuffed toy and a jacket around Isaac because he would not stop crying. He told her not to use the phone and asked her to help him revive Isaac, because otherwise, "[t]hey're going to take all the kids away." Appellant and Lopez immersed Isaac in a bathtub filled with water. When that failed to wake Isaac, Lopez attempted cardiopulmonary resuscitation again. Isaac did not respond. Lopez then poured rubbing alcohol on Isaac's body. He then wrapped Isaac in a blanket and put him in a crib.

That day, appellant and Lopez kept the other children in the apartment, telling them that Isaac was at the hospital. About 11:00 p.m. that night, Lopez left the apartment with Christian to purchase gasoline. When Lopez returned,

he instructed appellant and the children to go to bed. Appellant rose around 2:00 a.m. the following morning and saw Lopez in the kitchen. Lopez said he was going to erase Isaac's identifying features, and he took Isaac into the bathroom with the gasoline, a chair and a bucket. Appellant stood outside the bathroom while Lopez burned Isaac's body in the bucket. Lopez brought the body out of the bathroom and began wrapping it in plastic, instructing appellant not to look. At around 7:00 a.m., he left the house with the plastic-wrapped body, the bucket and the chair. Police officers subsequently arrested Lopez and discovered Isaac's body in his van.

An autopsy revealed that Isaac suffered 24 blunt force injuries before he died, four of which were inflicted near the time of death and the remainder of which were inflicted no more than one day before death. The tissue connecting his upper lip to his gum was torn, and one of his teeth was chipped. The pathologist who conducted the autopsy concluded that all of the injuries, with the possible exception of one bruise on Isaac's back, were nonaccidental.

Isaac's lungs were blotchy and blood had pooled in them, indicating that he suffocated. His blood and stomach contained ethanol (drinking alcohol), isopropanol (rubbing alcohol), brompheniramine (an antihistamine), and pseudoephedrine (a decongestant). The pseudoephedrine was present in levels indicating that Isaac had been fed between 80 to 90 milligrams of children's medicine, which was between five to 25 times the normal dosage for a child. In the opinion of the pathologist who conducted the autopsy, Isaac had a lethal amount of pseudoephedrine in his system when he died. The pathologist concluded that Isaac's death was probably caused by a combination of suffocation, the pseudoephedrine overdose and his injuries.

On March 1, 2005, an information was filed charging appellant with one count of assault on a child under eight years of age resulting in death (Pen. Code, § 273ab),[1] one count of second degree murder (§ 187) and one count of willfully causing a child to suffer under circumstances likely to result in death (§ 273a, subd. (a)) with an enhancement because death actually resulted (§ 12022.95). On June 26, 2006, a separate jury convicted Lopez of one count of assault on a child under eight years of age resulting in death (§ 273ab), one count of first degree murder during the commission of torture (§§ 187, 189, 190.2, subd. (a)(18)), and one count of willfully causing a child to suffer under circumstances likely to result in death (§ 273a, subd. (a)) with an enhancement for actually resulting in death. (§ 12022.95.)

At trial, the People's theory was that Lopez killed Isaac and that appellant aided and abetted Lopez by failing to perform her parental duty to protect

[1] All further statutory references are to the Penal Code unless otherwise noted.

Isaac. Over appellant's objection, the court instructed the jury that appellant had a duty to take all steps reasonably necessary under the circumstances to protect Isaac from harm. Also over objection, the court gave modified versions of CALJIC Nos. 3.01, 8.11 and 8.31, to the effect that appellant's failure to perform her duty would be the equivalent of an affirmative act for the purposes of finding aiding and abetting, implied malice and second degree murder. Appellant requested that the court instruct the jury according to CALJIC No. 4.40 (the defense of duress), but the court refused. On January 31, 2007, the jury convicted appellant on all counts. This is a timely appeal from the judgment.

## DISCUSSION

### I

Appellant argues that the trial court incorrectly instructed the jury that a parent may be liable for aiding and abetting a crime and for second degree murder on an implied malice theory by intentionally failing to act to protect his or her child from harm. We review de novo whether jury instructions given correctly state the law on this issue. (See *People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551, 82 P.3d 755].)

A person who aids and abets the commission of a crime is a principal to that crime. (§ 31.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 [29 Cal.Rptr.3d 423, 113 P.3d 100].) A person who aids and abets a crime may be liable " 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) "[W]hen an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 197 [37 Cal.Rptr.2d 236, 886 P.2d 1229] (*Heitzman*).)

In *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733 [7 Cal.Rptr.3d 744] (*Swanson*), the defendant was charged with committing a lewd or lascivious act on a child under 14. On two occasions, she stood by and said nothing while her boyfriend sexually fondled her daughter. The court extensively quoted *State v. Walden* (1982) 306 N.C. 466 [293 S.E.2d 780], in

which the Supreme Court of North Carolina held that a parent who is present while his or her child is being attacked, and who fails to take all steps reasonably possible to protect the child, commits an " 'act of omission . . . showing the parent's consent and contribution to the crime being committed.' " (*Swanson*, *supra*, 114 Cal.App.4th at p. 745.) Citing section 272, subdivision (a)(2), the *Swanson* court held that "[i]n California, parents have a duty 'to exercise reasonable care, supervision, protection, and control over their minor child[ren].' " (*Swanson*, at p. 746.) The court concluded that there was probable cause for the charges against the defendant because her failure to perform that duty aided the crime by encouraging its commission. (*Ibid.*)

Based on *Swanson*, the trial court gave the following special instruction to the jury:

"The word 'act' as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act.

"A parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child."

The trial court also gave the following instruction based on CALJIC No. 3.01 (we have italicized the trial court's additions):

"A person aids and abets the commission of a crime when he or she:

"(1) With knowledge of the unlawful purpose of the perpetrator, and

"(2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and

"(3) By act or advice *or by omitting or failing to act in those situations where a person is under a legal duty to act,* aids, promotes, encourages, or instigates the commission of the crime.

"Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

"Mere knowledge that a crime is being committed, and, *in the absence of a legal duty,* the failure to prevent it does not amount to aiding and abetting."

The trial court gave the following instruction based on CALJIC No. 8.11, which states in relevant part (additions italicized):

"Malice is implied when:

"1. The killing resulted from an intentional act *or an intentional omission or intentional failure to act in those situations where a person is under a legal duty to act*;

"2. The natural consequences of the act *or omission or failure to act* are dangerous to human life; and

"3. The act *or omission or failure to act* was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

"When it is shown that a killing resulted from the intentional doing of an act *or the intentional omission or intentional failure to act* with implied malice, no other mental state need be shown to establish the mental state of implied malice aforethought."

The trial court also gave the following instruction based on CALJIC No. 8.31 (additions italicized):

"Murder in the second degree is the unlawful killing of a human being when:

"1. The killing resulted from an intentional act *or an intentional omission or intentional failure to act in those situations where a person is under a legal duty to act*;

"2. The natural consequences of the act *or omission or failure to act* are dangerous to human life, and

"3. The act *or omission or failure to act* was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

"When the killing is the direct result of such an act *or omission or failure to act*, it is not necessary to prove that the defendant intended that the act *or omission or failure to act* would result in the death of a human being."

Appellant argues these instructions are erroneous to the extent they provide for aider and abettor liability based on failure to act because the discussion in *Swanson* is dictum on that issue. But the *Swanson* court held not only that the evidence supported the inference that appellant affirmatively acted to aid her daughter's molestation, but also, as an alternative basis for its conclusion, that her failure to act was a sufficient actus reus for this crime. (*Swanson*, *supra*, 114 Cal.App.4th at p. 744.) " 'When an appellate court

bases its decision on alternative grounds, none is dictum.' [Citation.]" (*People v. Minor* (1991) 227 Cal.App.3d 37, 42 [277 Cal.Rptr. 615].)

Appellant also argues that *Swanson* was wrongly decided. She contends, first, that section 272, subdivision (a)(2) is not authority for the conclusion reached because it states only a limited parental duty. We agree with her premise. Subdivision (a)(2) provides: "For purposes of this subdivision, a parent or legal guardian to any person under the age of 18 years shall have the duty to exercise reasonable care, supervision, protection, and control over their minor child." "[I]f the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the [statutory] language governs. [Citations.]" (*People v. Walker* (2002) 29 Cal.4th 577, 581 [128 Cal.Rptr.2d 75, 59 P.3d 150].) The phrase, "[f]or purposes of this subdivision," limits the effect of the following language to section 272, subdivision (a). Section 272, subdivision (a) provides, in relevant part, misdemeanor liability for a failure to act causing a child to come within the provisions of Welfare and Institutions Code sections 300, 601 or 602.[2] Section 272, subdivision (a)(2) applies to criminal liability for contributing to the dependency or delinquency of a minor. Because we agree with appellant on this issue, we do not consider her argument that the instruction inaccurately reflected the duty provided by section 272, subdivision (a)(2).

But section 272 is not the exclusive source of the parental duty to protect, because parents are under a common law duty to protect their children. "When a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere." (*Heitzman, supra,* 9 Cal.4th at p. 198.) A criminal statute may incorporate a duty imposed by another criminal or civil statute, and "may also embody a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children. [Citations.]" (*Ibid.*) "The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons—upon parents to aid their small children . . . a mother [may be guilty of criminal homicide] for failure to prevent the fatal beating of her baby by her lover . . . ." (1 LaFave, Substantive Criminal Law (2d ed. 2003) § 6.2(a)(1), p. 437.) "Even accomplice liability may be grounded in an omission to act." (*Id.* at p. 436.)

Appellant argues that while, under *Heitzman*, the common law may inform the scope and nature of a statutorily established duty to act, it does not

[2] Welfare and Institutions Code sections 300, 601 and 602 specify conditions upon which the juvenile court acquires jurisdiction over a child as a dependent or a delinquent. Subdivision (b) of section 602 of that code also states that persons alleged to have committed murder with a special circumstance listed in section 190.2, or certain sexual offenses, shall be prosecuted under the general law in a court of criminal jurisdiction.

permit criminal liability to flow from the common law where no statute imposes liability. Appellant misreads *Heitzman.* That case does not say that the common law may only inform an existing statutory duty; it says that a criminal statute may embody a common law duty. (*Heitzman, supra,* 9 Cal.4th at p. 198.) As an example, *Heitzman* cites *People v. Burden* (1977) 72 Cal.App.3d 603 [140 Cal.Rptr. 282], in which a father who willfully withheld food from his child, resulting in the child starving to death, was liable for murder based on his failure to perform his common law duty to care for his child. (*Heitzman, supra,* 9 Cal.4th at p. 198.) To recognize that a criminal statute may embody a common law duty to act, as *Heitzman* does, is not to impose criminal liability without a statute. The statute is still the source of liability; the common law only provides the rationale that failure to act can be equivalent to an affirmative act in some situations.

Appellant argues that common law does not impose criminal liability on parents who fail to act to protect their children. *Swanson* does not explicitly discuss common law parental liability, though it quotes extensively from *State v. Walden, supra,* 293 S.E.2d 780, in which the North Carolina court reasoned that parents' duty to protect their children is inherent in their common law duty to provide for their children's safety. (*Swanson, supra,* 114 Cal.App.4th at p. 745; *State v. Walden, supra,* at p. 786.) *Swanson* also parenthetically cites *People v. Stanciel* (1992) 153 Ill.2d 218 [180 Ill.Dec. 124, 606 N.E.2d 1201, 1211] (*Stanciel*), for its holding that "in light of [the] common law duty of parents to protect their children, [the] defendants could be liable for their children['s] murders, as aiders and abettors, based on their failure to protect the children from abusive boyfriends." (*Swanson, supra,* 114 Cal.App.4th at p. 746.) *Swanson* impliedly adopts *Walden* by quoting extensively from that case and reaching a holding consistent with its reasoning. Thus, the *Swanson* holding is based on the common law as well as section 272, subdivision (a)(2).

Our research has disclosed no California case other than *Swanson* that addresses whether a parent can aid and abet a crime victimizing his or her child by failing to intervene.[3] Most other jurisdictions that have considered the issue have decided it in the affirmative. In *State v. Walden, supra,* 293 S.E.2d 780, the defendant watched silently while a man beat her son with a belt over an extended period of time. The trial court instructed the jury that the defendant could be found guilty of aiding and abetting the assault on her son if she was present with the duty and reasonable opportunity to prevent it and failed to take reasonable steps to do so. The court approved these

[3] *People v. Culuko* (2000) 78 Cal.App.4th 307, 331 [92 Cal.Rptr.2d 789], cited by appellant, is inapposite. The instructions in that case did not allow the jury to find aiding and abetting based on inaction, and the court noted that there was ample evidence that the defendants actively aided and encouraged the crime. (*Ibid.*)

instructions, stating that although the general rule in North Carolina is that a person cannot aid and abet a crime by inaction, there is an exception where the common law imposes an affirmative duty to act. (*Id.* at pp. 784–785.) The court stated that the defendant's duty to protect her son "has long been recognized by the common law" and North Carolina statute,[4] and held that "the failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed." (*State v. Walden*, at pp. 786, 787.) *State v. Walden* has been followed in subsequent North Carolina decisions. (See *State v. Ainsworth* (1993) 109 N.C.App. 136 [426 S.E.2d 410, 415–416]; *State v. Noffsinger* (2000) 137 N.C.App. 418 [528 S.E.2d 605, 611].)

In *Stanciel, supra*, 606 N.E.2d 1201, the defendants left their young children alone with boyfriends they knew had physically abused the children in the past. The boyfriends beat the children to death. The defendants argued that they did not aid and abet the murders because they took no action to promote the abuse.[5] The court declared that "[c]riminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so." (*Stanciel*, at p. 1211.) The court followed earlier state precedent (*The People ex rel. O'Connell v. Turner* (1870) 55 Ill. 280, 284)[6] in holding that the defendants aided their children's murders by ignoring their duty to protect them. (*Stanciel, supra*, 606 N.E.2d at p. 1211; see also *People v. Pollock* (2002) 202 Ill.2d 189 [269 Ill.Dec. 197, 780 N.E.2d 669, 684] ["By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct."]; *State v. Edgar* (2006) 281 Kan. 47 [127 P.3d 1016, 1023–1024] [" ' "[w]hile it is true that the mere presence of a person at the scene of a crime is insufficient to constitute him a principal . . . the trier of the facts may consider failure of such person to oppose the commission of the crime in connection with other circumstances and conclude therefrom that he assented to the commission of the crime, lent his countenance and approval thereto and thereby aided and abetted it. . . . *This, it seems to us, is particularly true when the person who fails to interfere owes a duty to protect as a parent owes to a child.*" ' "]; and *Michael v. State* (Alaska Ct.App. 1988) 767 P.2d 193, 198–199 [defendant knew his wife was beating their daughter,

[4] The statute provided misdemeanor liability for knowingly or willfully contributing to the delinquency or neglect of a minor. (N.C. Gen. Stat. former § 14-316.1.)

[5] The Illinois accountability statute stated in relevant part: " 'A person is legally accountable for the conduct of another when: [¶] . . . [¶] . . . [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.' " (*Stanciel, supra*, 606 N.E.2d at p. 1209.)

[6] *People ex rel. O'Connell v. Turner* states the duty in terms of "natural law." (*The People ex rel. O'Connell v. Turner, supra*, 55 Ill. at p. 284.)

but he did nothing to stop it; in upholding his conviction for assault, court said "the common law and Alaska statutes establish a clear duty upon a parent to protect his child.[7] It seems clear under the law that where the parent fails to carry out this duty and the child is injured as a result, the parent has caused the child's injuries and may be held criminally liable"], reversed on other grounds in *Michael v. State* (Alaska 1991) 805 P.2d 371.)

A minority of jurisdictions has decided that parental inaction does not provide a basis for criminal liability. In *Commonwealth v. Raposo* (1992) 413 Mass. 182 [595 N.E.2d 773], the defendant was convicted of rape as an "accessory before the fact." (*Id.*, 595 N.E.2d at p. 776.) She knew her boyfriend intended to have intercourse with her daughter, and also knew her daughter was unwilling. The boyfriend did so at least twice. At least once, the defendant told him to stop but did nothing beyond that. The defendant eventually took her daughter to a police station, where they gave statements about the abuse. The Commonwealth argued that the defendant had a common law duty to protect her daughter and that her failure to do so was sufficient to make her liable as an accessory. (*Ibid.*) However, the court reversed her conviction, holding that the relevant statute and Massachusetts case law require an affirmative act before accessory liability may be imposed.[8] (595 N.E.2d at p. 777.)

In *State v. Jackson* (1999) 137 Wn.2d 712 [976 P.2d 1229], the defendants' foster daughter was injured and later died while in her foster father's care. Her injuries were inconsistent with his explanation. The trial court's instruction to the jury permitted it to find the foster parents liable as accomplices for failure to perform their duty to protect their daughter. They were subsequently convicted of second degree felony murder.[9] The court reversed their convictions because, after examining the legislative history of the Washington

[7] The statutes provided, in relevant part, misdemeanor liability for " 'person[s] legally charged with the support of a child under 18 years of age . . . [who] fail[] without lawful excuse to provide [food, care, clothing, shelter, medical attention and education] for the child.' " (*Michael v. State, supra*, 767 P.2d at p. 198.) The court also cited a statute providing criminal liability for intentionally abandoning a child in circumstances likely to lead to the child's injury. (*Ibid.*)

[8] The accessory statute read: " 'Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon.' " (*Commonwealth v. Raposo, supra*, 595 N.E.2d at p. 775.)

[9] The instruction stated in relevant part: "The word 'aid' means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. *Unless there is a legal duty to act,* more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; *a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so.*" (*State v. Jackson, supra*, 976 P.2d at p. 1233.)

accomplice liability statute, it determined that the Legislature had deliberately rejected the possibility of accomplice liability for failure to act. (976 P.2d at pp. 1233–1235.)

We are satisfied that the better rule is that parents have a common law duty to protect their children and may be held criminally liable for failing to do so: a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack. (See *Heitzman*, *supra*, 9 Cal.4th at p. 198.) For these reasons, we agree with the *Swanson* court in its conclusion that aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack. For the same reasons we conclude that such intentional conduct in support of an aider and abettor can support liability for implied malice murder. (*Heitzman*, at p. 198; *People v. Burden*, *supra*, 72 Cal.App.3d at pp. 618–621 [affirming father's second degree murder conviction for willfully failing to perform his duty to feed his infant son, who starved to death].)

We emphasize, however, that liability as an aider and abettor requires that the parent, by his or her inaction, intend to aid the perpetrator in commission of the crime, or a crime of which the offense committed is a reasonable and probable outcome. In this case, the modified instructions correctly required the jury to find appellant's intent and conduct separately. Under these instructions, the jury could reasonably infer appellant's intent to aid Lopez from her presence at the scene of the crime, her duty to protect her child and her failure to do so.[10] As we have seen, other jurisdictions agree. (See *State v. Walden*, *supra*, 293 S.E.2d at p. 787 ["It will still be necessary . . . that it be shown that the defendant said or did something showing his consent to the criminal purpose and contribution to its execution"]; *Ex Parte C.G.* (Ala. 2002) 841 So.2d 292, 301 [defendant's failure to prevent abuse by boyfriend allowed jury to reasonably conclude that defendant valued relationship with boyfriend more than child's safety]; *People v. Pollock*, *supra*, 780 N.E.2d at p. 684 [parent's failure to act may be deemed to implicitly sanction abuse of child]; *State v. Williquette* (1985) 125 Wis.2d 86 [370 N.W.2d 282, 285] [knowing failure of mother to intervene to prevent abuse of her children allows inference of her intent to assist perpetrator].)

Like the North Carolina decision upon which it is based, *Swanson* moderates its statement of parental duty with the qualification that parents do

[10] The prosecution urged the jury to so infer: "When a parent is present and fails to take all steps that are reasonably possible or necessary to protect their child from attack from another person, like what happened in this case, that is an omission. And that omission, which is an act for these purposes, shows that parent's, Ms. Rolon's, consent and participation in the crimes she is being prosecuted for."

not have the duty to risk death or great bodily harm to protect their children, and the relative size and strength of the parties involved is relevant to a determination of what is reasonable. (*Swanson, supra,* 114 Cal.App.4th at p. 745.) In context, *Swanson* qualifies the duty to protect by not requiring parents to take unreasonable action to protect their children. Appellant claims the instruction does not mention that limitation, and thus imposes a "hero's duty" to protect her child at the risk of her own life.

Appellant argues, in effect, that the statement in the instruction that a parent must take "every step reasonably necessary under the circumstances" implies that a parent must do whatever is necessary to protect his or her child, regardless of the danger to the parent in doing so. That is not a reasonable reading of the language in the instruction, and a reasonable juror would not understand it in that way, absent being urged to do so by the court or by counsel in argument. The instruction informs the jury that the parent's duty is to take all steps *reasonably necessary under the circumstances*, not to take every possible step regardless of risk of harm to the parent. In this case, defense counsel did not mention the instruction—or the parental duty—in his closing argument, and the prosecutor argued the issue in the terms appellant claims the jury should have heard.[11] Although this part of the instruction could have been drafted with greater clarity, it is not probable a reasonable jury would have understood it in the manner appellant suggests. (*People v. Mayfield* (1997) 14 Cal.4th 668, 776 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Kelly* (1992) 1 Cal.4th 495, 526 [3 Cal.Rptr.2d 677, 822 P.2d 385] [partially due to counsel's correct explanation of relevant law, no reasonable likelihood that jury misapplied instruction].)

---

[11] The prosecutor argued as follows: "What that means to take steps reasonably necessary, it will depend on different circumstances, require different steps. You take a look at who is involved, what the situation is. A parent is not required to lay down their life for their child. In some circumstances, maybe they can subdue an attacker or maybe it is not reasonable to do that. In some circumstances, it may be reasonable for them to just yell for help. It may be reasonable to take the child out of the situation. It may be reasonable to call 911. Depends on the particular circumstances where that crime is occurring or what the situation is, what is reasonable. It is not reasonable to require a person to suffer great bodily harm or to lay down their life, but they are required to take every reasonable step necessary to protect their child or provide medical attention as necessary."

*Swanson, supra,* 114 Cal.App.4th at page 745 states: " 'This is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children. To require such, would require every parent to exhibit courage and heroism which, although commendable in the extreme, cannot realistically be expected or required of all people. . . . In some cases, depending upon the size and vitality of the parties involved, it might be reasonable to expect a parent to physically intervene and restrain the person attempting to injure the child. In other circumstances, it will be reasonable for a parent to go for help or to merely verbally protest an attack upon the child. What is reasonable in any given case will be a question for the jury after proper instructions from the trial court.' "

Appellant contends the instruction does not accurately reflect her parental duty under *Swanson* because it phrases the parental duty in terms of taking "every step reasonably *necessary* under the circumstances in a given situation . . . to protect the child from harm," while *Swanson* phrases it in terms of taking " 'all steps reasonably *possible* to protect the parent's child.' " (*Swanson, supra,* 114 Cal.App.4th at p. 745, italics added.)

The trial court was of course bound to follow *Swanson,* the sole controlling authority on this precise issue at the time. But the court was not bound to quote that opinion verbatim in its jury instructions; instead, the court had a duty to accurately restate the principles articulated in *Swanson* in a clear and impartial manner. (Cal. Rules of Court, rule 2.1050(e).) To the extent the language in the instruction differed from the precise language used in *Swanson,* the instruction given by the court resolved the distinction in appellant's favor. A duty to take every reasonably possible step to protect the child is more onerous than a duty to take all reasonably necessary steps to that end.

Appellant argues that her actions were reasonable under the circumstances because she did take every step reasonably necessary under the circumstances. We reverse a conviction for lack of substantial evidence if a review of the record in the light most favorable to the judgment discloses no evidence upon which a reasonable trier of fact could find guilt beyond a reasonable doubt. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1321–1322 [66 Cal.Rptr.3d 481].)

In this case, appellant attempted to strike Lopez at least once during the week before the homicide. According to her statement to the interrogating officers, she reprimanded Lopez when he punched her son, and after he told her to "shut up" and not involve herself, she continued "fighting" with him. She did not explain what she meant by "fighting." She made no effort to aid her son: she did not scream, call 911, ask a neighbor to help or call for help, or do anything else. Instead, she went to sleep and left her son alone with Lopez although she knew Lopez had recently punched him and thrown him against a wall. From this evidence, a reasonable jury could infer that appellant was capable of taking some action to protect her child and that she chose not to do so, but to go to sleep and leave her son alone with Lopez. These inferences support the conclusion that appellant did not take every step reasonably necessary under the circumstances to protect her son.

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1206.

## DISPOSITION

The judgment is affirmed.

Willhite, J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 18, 2008, S162831. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.