Filed 10/17/25  P. v. Ingram CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AMBER CHRISTINE INGRAM,<br><br>Defendant and Appellant. | C099538<br><br>(Super. Ct. No. 09F04787) |

Defendant Amber Christine Ingram appeals the trial court's denial of her petition for resentencing following an evidentiary hearing.  (Pen. Code, § 1172.6, subd. (d).)[1] Ingram contends that substantial evidence does not support the trial court's determination that she had the required mental state for aiding and abetting second degree murder on a

---

[1] Undesignated statutory references are to the Penal Code.  Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  Although Ingram filed her petition under former section 1170.95, we cite to the current section number.

1

failure-to-protect theory. Alternatively, Ingram argues that we should remand the matter to allow the trial court to reconsider its decision in light of the California Supreme Court's intervening decision in *People v. Collins* (2025) 17 Cal.5th 293 (*Collins*). The People concede that, if we conclude that *Collins* should be considered by the court below, a remand for reconsideration in light of *Collins* would be appropriate. We conclude that is the proper disposition.

BACKGROUND

I.

Ingram began dating Eduardo Zamora in early 2009 and moved into his house with her five-year-old son Braeden in March of that year. Zamora lost his job in April, and Ingram withdrew Braeden from daycare so that Zamora could watch him during the day. Zamora's physical abuse of Braeden began a few weeks later. Around that time, Braeden began urinating in bed and defecating in his pants, which prompted more abuse by Zamora.

During the last month of Braeden's life, Zamora beat him between 10 and 12 times. Each time, Ingram gave Braeden an analgesic and ice packs for the pain. About nine days before Braeden's death, Zamora repeatedly hit him with a belt for defecating in his pants. When Ingram showered Braeden afterwards, she saw numerous bruises on his back, buttocks, and legs in various stages of healing. Ingram observed "severe" bruising on Braeden three days and the night before his death. Braeden had injuries "pretty much everywhere," and Ingram was "[v]ery concerned" for his safety. Nonetheless, she did not take Braeden to the doctor because she feared he would be taken from her; she also did not take him out in public out of concern that someone would call the police. Ingram told authorities that all of Braeden's bruising occurred within 10 days of his death. On the evening of June 16, 2009, Ingram confronted Zamora about his physical abuse of Braeden, warning he was going to end up in prison.

2

The next day, Ingram again left Braeden in Zamora's care. Zamora called Ingram around 10:00 a.m. to inform her that Braeden had defecated in his pants. Ingram told him to put on a movie and she would clean it up later. About 30 minutes later, Zamora called to tell Ingram that Braeden was not breathing. Ingram told Zamora to call 911.

Responding paramedics found Braeden unresponsive on the floor. He was very pale, with bruises and cuts "from head to toe," including on his chest, spine, and back. He had bloodshot eyes, was not breathing, and had no pulse or neurological signs. Braeden was transported to the hospital.

The treating physician observed that Braeden had sustained "extremely extensive" injuries. Braeden showed signs of "serious inner-abdominal hemorrhaging," which would take hours, if not days, to develop. His back was covered with overlapping bruises too numerous to individually describe. He had deep abrasions and lacerations to his head, face, and lip. He had bruises on his ears and around his eye as well as hemorrhaging in his eyes. The physician opined that Braeden's bruising "was in various stages of healing, which suggested that there was some of it which had been done at an earlier time and some at a later time." The bruising to Braeden's heart and chest area was well-developed, suggesting it was not recent.

The doctor who performed the autopsy observed overlapping bruising and abrasions all over Braeden's body. Some of the injuries to his torso were likely three or more days old, and other injuries to the back and torso were at least 24 to 48 hours old. The doctor explained that bruises take time to develop, and generally that development ceases after death. Braeden also had a broken collarbone and five rib fractures. He had numerous internal injuries, including bruising of various organs and hemorrhaging of the lining of the heart and intestines. The official cause of his death was "multiple blunt force injuries."

Ingram told investigating authorities that Zamora made her feel like she was "on top of the world." He said all the things she wanted to hear about herself. She conceded

3

that she should have left after Zamora first beat Braeden and that Braeden would still be alive if she had taken him to the doctor or contacted the authorities. But she was in "complete denial" about what was going on, even though she saw more and more bruises on Braeden over the course of two weeks. She allowed Zamora to murder Braeden because of her need for love and state of denial that permitted her to believe that everything was going to be alright. Ingram valued her relationship with Zamora over Braeden's welfare. Braeden was nearly six years old when he died.

A jury convicted Ingram of one count of second degree murder and one count of felony child endangerment. The jury also found true the allegation that she willfully caused a child to suffer and inflicted unjustifiable physical pain and injury that resulted in death. A separate jury convicted Zamora of first degree murder, torture, and assault on a child resulting in death. The trial court sentenced Ingram to an aggregate prison term of 15 years to life. This court affirmed the judgment. (*People v. Ingram* (Dec. 17, 2012, C067276) [nonpub. opn.].)

## II.

Approximately seven years later, Ingram filed a petition for resentencing under section 1172.6. The trial court denied the petition at the prima facie stage, reasoning that she could have been convicted of direct aiding and abetting, even though her jury was only instructed on a natural and probable consequences theory. This court reversed the trial court's order and remanded the matter for the trial court to issue an order to show cause and conduct further proceedings. (*People v. Ingram* (Jan. 10, 2022, C093280) [nonpub. opn.].)

At the evidentiary hearing that followed, the People asked the trial court to consider specified portions of the record of Ingram's original trial as well as transcripts and materials related to her previous parole hearing. Neither party presented live testimony. The People asserted that Ingram was still guilty of implied malice murder based on a theory of failure to protect. Ingram argued that the evidence established her

4

intent to aid and abet child abuse, but not murder. She maintained that nothing in the record established that Zamora's abuse objectively presented a high probability of death or that she knew that leaving her son in Zamora's care on the day in question would result in him committing an act with a high risk of death. The matter was to be taken under submission upon receipt of the trial transcripts.

In a lengthy written ruling, the trial court found Ingram guilty beyond a reasonable doubt of implied malice second degree murder and denied her resentencing petition. The court applied the analysis set forth in *People v. Rolon* (2008) 160 Cal.App.4th 1206 (*Rolon*), which explained that a parent "has a duty to protect . . . her young child and may be criminally culpable on . . . an implied malice theory for murder where the parent fails to take reasonably necessary steps for the child's protection, so long as the parent, with the ability to do so, fails to take those steps with the intent of facilitating the perpetrator's assaultive offense." (*Id.* at p. 1209.) The court rejected Ingram's argument that *Rolon* required the People to establish her "actual knowledge" that Zamora would endanger her son's life on the specific day he died and that when she left "Braeden in Zamora's care that morning [it] was for the purpose of allowing Zamora to beat him with a high probability of death—that morning." It reasoned, "[n]o court had read *Rolon* so narrowly."

With respect to the required actus reus, the trial court explained that, to be guilty of implied malice murder under an aiding and abetting theory, a defendant "must, by words or conduct, aid in the commission of a life-endangering act." In this case, Ingram "aided Zamora's life-endangering actions by leaving Braeden alone with him knowing the abuse was continuing." Further, her "decision was a proximate cause of Braeden's death. But for [her] leaving Braeden alone with Zamora, knowing of the ongoing abuse, Braeden would not have died."

The trial court also found that the People had proved that Ingram harbored the requisite mental state. The court acknowledged that Ingram presumably had not intended

5

for Braeden to be murdered that morning, but, it determined, "that is not the test." Rather, the mental state required for direct aiding and abetting " 'is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (Bolding omitted.) Further, "in the context of a parent-child relationship, a parent who knowingly fails to take reasonable steps to stop an attack on her child may be criminally liable for the attack if the reason for failing to intervene is to aid and abet the attack. [Citation.] . . . 'Aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child [from] attack . . . [L]iability as an aider and abettor requires that the parent by his or her inaction, intend to aid the perpetrator in commission of the crime.' "

The trial court found "[t]hat is what the evidence demonstrate[d] here." "By the time of Braeden's death, defendant was well aware that Zamora's continuing abuse threatened her son's life. She had administered first aid to Braeden at least 10 to 12 times in the days before his death, avoiding medical treatment because she feared she would lose custody. [¶] Defendant repeatedly told Zamora to stop his abuse. Tragically, the night before Braeden's death she warned Zamora he would end up in prison for child abuse. She had decided to move out because of Zamora's abuse. But, on the day of Braeden's death, she nevertheless again left him alone with Zamora." As Ingram admitted to the parole board, she had been in complete denial, " 'knowing something was happening and not doing anything about it. . . . [I]t was not caring about the welfare, welfare for him at that point. That's what it boils down to is I didn't act. I should have acted.' "

In view of this evidence, the trial court found the "record amply demonstrates defendant knew Zamora was seriously abusing Braeden, endangering his life, and would continue to do so. Defendant thus clearly understood the abuse Braeden was suffering was dangerous to human life. And she knew if she continued to leave Braeden alone with

6

Zamora, the likelihood her son would be killed was more than 'remote' or a 'mere possibility.' [Citation.] [¶] But in the end, defendant placed her relationship with Zamora above Braeden's safety, allowing Zamora to continue beating her child rather than end her relationship with him." The court thus found "beyond a reasonable doubt that when defendant left Braeden alone in Zamora's care that morning, she implicitly sanctioned and facilitated Zamora's ongoing, life-endangering abuse. She did so knowing there was a high degree of probability that Braeden would die if the abuse continued. . . . [I]n doing so, defendant acted in conscious disregard for human life. It is beyond question that defendant knew how serious the abuse had become. Yet, she left Braeden in Zamora's hands, placing her relationship with Zamora over her son's safety— and ultimately, his life."

Based on these findings, the trial court ruled that, beyond a reasonable doubt, Ingram "is guilty of implied malice second degree murder as an aider and abettor in her son's tragic death." The court thus denied her petition for resentencing.

Ingram timely appealed.

DISCUSSION

I.

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) narrowed the scope of the felony-murder rule and eliminated the natural and probable consequences doctrine as a basis for murder liability. (*People v. Curiel* (2023) 15 Cal.5th 433, 448-450.) Among other things, the enactment amended section 188 to require that a principal convicted of murder "act with malice aforethought." (Stats. 2018, ch. 1015, § 2, subd. (a)(3).) It further provided that malice "shall not be imputed to a person based solely on his or her participation in a crime." (*Ibid.*) It also added a procedure, now codified in section 1172.6, to permit individuals convicted of murder under prior law to request that their convictions be vacated and to seek resentencing. (Stats. 2018, ch. 1015, § 4; *Curiel*, at pp. 449-450.)

7

If a resentencing petition sets forth a prima facie case for relief, a trial court must hold an evidentiary hearing at which the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under current law. (§ 1172.6, subds. (c) & (d); *People v. Strong* (2022) 13 Cal.5th 698, 708-709.) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); see also *People v. Emanuel* (2025) 17 Cal.5th 867, 885.) Where "there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, at p. 988.)

II.

The trial court determined that Ingram was guilty of aiding and abetting implied malice second degree murder under a failure-to-protect theory. "[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction for first degree murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act

8

was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)  Liability for directly aiding and abetting implied malice murder "is based on the combined actus reus of the participants and the aider and abettor's own mens rea." (*Id.* at pp. 990-991.)  " 'For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Id.* at p. 991.)

After the trial court ruled on Ingram's petition in this case, our state Supreme Court decided *Collins*.  In that decision, the state high court "clarif[ied] the requisite elements of implied malice murder in the distinct context of conferring criminal liability based on one's failure to act." (*Collins*, *supra*, 17 Cal.5th at p. 307.)  The court began by affirming "the general principle articulated in *People v. Rolon* (2008) 160 Cal.App.4th 1206 (*Rolon*) that, based on common law, ' "[a] parent has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child" ' [citation] and 'aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack' [citation]." (*Collins*, at p. 308.)  The court noted, however, that *Rolon* had "allowed for murder liability based on a parental duty to act under the natural and probable consequences doctrine." (*Ibid.*)  After Senate Bill No. 1437 (2017-2018 Reg. Sess.) was enacted, that part of *Rolon* was no longer good law.  (*Collins*, at p. 309.)

9

*Collins* further explained that "the parental duty to protect has bounds." (*Collins*, *supra*, 17 Cal.5th at p. 309.) The parent must be aware that his or her duty to protect has arisen; and what a parent may reasonably do to protect his or her child will depend on the particular circumstances. (*Ibid.*) These circumstances include the relationship between the child and the direct perpetrator as well as whether the parent has been subjected to the perpetrator's abuse. (*Id.* at pp. 309-310.)

The high court "further clarif[ied] . . . that, while criminal liability based on the failure-to-protect doctrine does not necessarily require that the parent be present for or actively participate in the perpetrator's acts, liability for murder on a failure-to-protect theory is appropriately reserved for individuals who actually know to a substantial degree of certainty that a life-endangering act is occurring or is about to occur and failed to act in conscious disregard for life." (*Collins*, *supra*, 17 Cal.5th at p. 310.) "[O]nly then can it be said that the defendant knows that failure to intercede . . . will endanger the victim's life, and that the defendant's choice to do nothing has been made with conscious disregard for that life." (*Ibid.*) The court reasoned that the "requirement of a sufficiently blameworthy mental state is critical to prevent the failure-to-protect doctrine from giving rise to a 'broad, nonspecific' liability out of proportion to the defendant's culpability for harm they did not inflict, stemming from risks they did not create." (*Id.* at pp. 310-311.)

Addressing defendant Collins's liability for murder under a theory of direct aiding and abetting, the court applied the standard it had clarified in *Reyes*. (*Collins*, *supra*, 17 Cal.5th at pp. 311-320.) The court explained that, under that standard (and as noted above), the required mens rea, " ' "which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." ' " (*Id.* at p. 311.) And "[f]or murder liability to attach to a parent as an aider and abettor based on their failure to protect, the parent must knowingly fail to protect their child from the life-endangering act

10

for the purpose of facilitating that life-endangering act and such failure to act must in fact assist in the commission of the life-endangering act. [Citation.] To establish that the parent's failure to act in fact assisted the commission of the life-threatening act, it must be ' "shown that the defendant said or did something showing his [or her] consent to the criminal purpose and contribution to its execution." ' " (*Id.* at p. 312, citing *Rolon*, *supra*, 160 Cal.App.4th at p. 1219.) In Collins's case, the court directed the vacatur of her murder conviction, concluding (among other things) that there was insufficient evidence that Collins knew, to a substantial degree of certainty, that the perpetrator intended to commit the life-endangering acts at the time they occurred. (*Collins*, at pp. 300, 313-314, 323.)

In this case, the trial court applied the standard embraced in *Reyes* and discussed in *Collins* to find that Ingram harbored the required mens rea: whether she had knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life. But the trial court lacked the benefit of *Collins*'s clarification regarding liability for implied malice murder in the failure-to-protect context—namely, that a defendant must "actually know *to a substantial degree of certainty* that a life-endangering act is occurring *or is about to occur* and failed to act in conscious disregard for life." (*Collins*, *supra*, 17 Cal.5th at p. 310, italics added.) That standard may bear on the trial court's analysis in this case, where the court expressly rejected Ingram's argument that the People had to establish that Ingram knew Zamora's abuse presented a life-endangering risk on the specific day in question. (See also *Collins*, at pp. 313-314 [finding insufficient evidence that defendant knew the perpetrator intended to commit the life-endangering act at the time it occurred].) Given these circumstances, we believe that vacatur and remand are appropriate to allow the trial court to conduct any additional required factual inquiry and apply *Collins*'s clarification of the governing standards to the facts as the trial court finds them.

## DISPOSITION

The trial court's order denying Ingram's petition for resentencing is vacated, and the matter is remanded for reconsideration in light of the California Supreme Court's decision in *Collins*, *supra*, 17 Cal.5th 293.

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
MESIWALA, J.