Filed 12/20/13  P. v. Superior Court CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B250586 |
| Petitioner, | (Los Angeles County Super. Ct. No. BA388496) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| SELENE BEATRIZ OLMOS, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Frederick N. Wapner, Judge.  Petition granted.

Jackie Lacey, District Attorney, Phyllis C. Asayama and Roberta T. Schwartz, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Tom R. Medrano and Jason H. Cox for Real Party in Interest.

_____

Petitioner, the People, charged Robert Antonio Elias and real party in interest Selene Beatriz Olmos each with three offenses in the death of Selene's son Brian Olmos: murder (Pen. Code, § 187); assault on a child by means of force likely to cause great bodily injury, resulting in death (§ 273ab, subd. (a)); and child abuse (§ 273a, subd. (a)).[1] After a preliminary hearing, the magistrate bound over Elias and Olmos on all of the charges. The trial court subsequently granted Olmos's section 995 motion to set aside the information with respect to the charges of murder and assault on a child by means of force likely to cause great bodily injury. The People filed a petition for a writ of mandate, contending the trial court erred by granting Olmos's motion with respect to these charges. We agree and grant the petition.

## BACKGROUND

The felony complaint in this case was filed sometime in early November 2011. It charged each defendant with three offenses: count 1, murder; count 2, assault on a child by means of force likely to cause great bodily injury resulting in the child's death, hereinafter sometimes referred to as "assault"; and count 3, child abuse. In addition, it alleged that in the commission of the child abuse, Elias and Olmos willfully caused, permitted a child to suffer, and inflicted upon a child unjustifiable physical pain and injury that resulted in death. (§ 12022.95.) Olmos waived arraignment and pleaded not guilty to each charge.

### 1. Preliminary hearing

The joint preliminary hearing for Olmos and Elias was conducted on October 19, 2012. The evidence adduced at the preliminary hearing showed that Brian Olmos, who was about 18 months old, arrived at Beverly Hospital about 5:45 p.m. on June 18, 2011. (Undesignated date references pertain to 2011.) The paramedics who transported Brian to the hospital rated him a "111" on the Glasgow Coma Scale, meaning he was "basically unresponsive, and he's neurologically not functioning." He was placed on life support

---

[1] Undesignated statutory references are to the Penal Code.

and ultimately pronounced dead on June 20 about 3:00 p.m. Selene Olmos was Brian's mother, and Elias was Selene Olmos's boyfriend. Elias, Olmos, and Brian lived in the same house as Elias's brother, sister-in-law, and their infant.

Deputy Medical Examiner Dr. Louis Pena, who performed an autopsy on Brian, testified that Brian died as a result of multiple injuries resulting from "a collection" of blunt force trauma events. Pena agreed that Brian's injuries were consistent with "shaken impact," that is, shaking combined with a head impact, and Pena identified the site of the impact as the left side of Brian's head. That impact caused severe intracranial hemorrhages. Brian had "fresh" or "recent" bruises on the top and left side of his head, the left side of his neck, his chin, the left and right sides of his upper legs, his chest, left upper back, mid-back, lower back, right back, upper right arm, upper left arm down to his left elbow, and the left ear from the earlobe to the back of the ear. The bruise on Brian's upper right arm was a "loop-type pattern" that could have been caused by squeezing with a hand or a belt. Brian also had numerous "faded," but still "recent," bruises on both of his legs. A circular bruise on Brian's upper right leg was consistent with a fist or the heel of a shoe. Brian had large subcutaneous hemorrhages on the left side of his head, the left side of his neck, the left elbow area, the left upper back, the right lower back, the left buttocks, and the chest. Brian also had retinal and optic nerve hemorrhaging. He suffered a subdural hematoma on the left side of his head, and some of the blood had moved into the base of the brain and the spinal column. Brian also had 10 rib fractures of various ages; "some were old and some were recent," "meaning the day of the incident perhaps, to a number of weeks out," perhaps a month. Pena opined the rib fractures were "likely inflicted, meaning like a punch or a blow."

Pena opined that although some of Brian's bruises may have been attributable to "a walking-age child banging into things," the totality of injuries and their distribution throughout his body were "not typical for an accident, unless it's a motor vehicle" accident. Pena further testified that Brian would have displayed symptoms such as

3

lethargy, vomiting, seizures, or respiratory arrest within a very brief time after "the moment that the impact occur[red]."

Detective Steven Blagg, who was assigned to investigate Brian's death, testified he spoke with Olmos on June 27. She was not yet in custody. Olmos told Blagg that Elias "did not like the fact that she had a child with another man," and "had gotten to the point where he just didn't care for Brian." Elias "would get mad at Brian when he would cry, would strike Brian. It started off with spanking and then escalated to the point where Mr. Elias would actually punch Brian, would lift him out of his playpen by his arms, yell at him. [¶] If she tried to intervene, Mr. Elias would then—had beat[en] her in the past for attempting to intervene on his beating of Brian." Elias told Olmos if she went to the police or exposed his behavior, "she would get worse than Brian got, as far as a beating." Olmos had seen Elias punch Brian in the rib cage. Elias "would lift up Brian's arms to move them out of the way and then, with a balled-up fist, punch Brian in the rib cage area." Elias "would just continue to punch him." Brian would cry, and Elias would warn him not to cry while Elias was beating him. Olmos had also seen Elias shake and slap Brian and pull Brian's hair. Brian seemed to be in pain a lot, had a lot of bruises, had difficulty sleeping, and withdrew from Elias.

Olmos told Blagg that Elias began abusing Brian around March of 2011, but she also said she had not taken Brian to the doctor for his check-up when he turned one (around December of 2010) "'because the doctor would see the bruises.'" Olmos admitted to Blagg that she sometimes also struck Brian on the legs and buttocks and slapped his face.

Olmos told Blagg that Brian cried a lot the last few weeks of his life. She said Brian had fallen a few weeks before his death. Olmos saw Elias spank Brian on the buttocks on June 17, but the last time she saw Elias "abuse" Brian was a few days before June 18.

Olmos told Blagg that Elias had punched her face and body for "small things," such as paying too much attention to Brian. She never reported this to the police,

4

although she had previously called the police when Brian's father beat her, which resulted in the arrest and deportation of Brian's father.

Olmos told Blagg that on the morning of June 18 she left Brian in the care of Elias's sister-in-law, Maria. Olmos clarified that she left Brian in his playpen in "their bedroom" with the TV on and informed Maria that she was leaving for work. Olmos drove Elias to his job, then went to her job at a Taco Bell. Brian had bruises on his chest, arms, and legs at that time. Olmos got off work around 3:00 p.m. and drove home. Brian was awake, alert, seated in a playpen, and seemed to be watching TV. Olmos fed Brian half of a bean burrito she had brought from Taco Bell and part of a smoothie Maria had made. Olmos dressed Brian because Elias was planning to take Brian to a party at the home of Elias's father. A little before 4:00 p.m. Olmos left the house for her second job.

Olmos told Blagg that Elias called her at work about 5:14 p.m. and told her Brian was vomiting uncontrollably and not breathing well. She told him to put some water on Brian's head and get Maria to help revive Brian. Olmos left work and drove home. Before she reached the house, she saw Elias running, carrying Brian. Brian was unconscious and did not appear to be breathing. Elias got into the backseat with Brian and Olmos began driving to a hospital. After Olmos had driven just a block, Elias complained she was driving too fast and told her to pull over and let him drive. Olmos complied. She told Blagg that Elias did not appear to be in a rush to get them to the hospital. Olmos saw an ambulance at a restaurant and told Elias to stop there and get the ambulance attendants to help. Elias stopped, went in the restaurant, and eventually emerged with the ambulance attendants. Paramedics then arrived and took Brian to the hospital.

Blagg spoke to Elias on the night of June 20. Elias said Brian was seated in the playpen, drinking milk when Elias arrived home from work about 4:55 p.m. on June 18. Elias found a note from Olmos indicating that Elias should feed Brian the other half of the bean burrito. Elias got ready to go to his father's house. When he lifted Brian from the playpen to dress him, Brian began to vomit "violently" and brown fluid flowed from

5

Brian's nose. Elias asked Maria for help, then called Olmos at her workplace. He did not call 911 or ask anyone to call 911. He carried Brian outside.

Elias denied punching Brian at any time, but admitted he had sometimes disciplined Brian by pulling his ear, spanking, slapping, and shaking him. Elias told Blagg that he last shook Brian two to three weeks earlier.

Blagg obtained time records from Olmos's employers showing that on June 18 Olmos was on duty at her first job from 10:59 a.m. until 3:07 p.m., and was on duty at her second job from 4:03 p.m. until 5:12 p.m. Blagg also obtained records from Elias's employer reflecting that he was on duty on June 18 from 10:54 a.m. until 3:58 p.m.

Blagg also spoke to Maria and Elias's brother, who told him they had never seen Elias hit Brian. Maria said that on one occasion when Brian had a bruise on his cheek, Olmos said that Brian had hit himself. Maria further stated that sometimes Olmos left Brian at the house without asking Maria to take care of him.

The magistrate held Olmos and Elias to answer on all counts and on the section 12022.95 allegation. The People filed an information charging Elias and Olmos with the same offenses and enhancement allegation.

**2.      Olmos's section 995 motion**

Olmos filed a section 995 motion to set aside the information, which the People opposed. After briefing and argument, the trial court granted Olmos's motion with respect to the charges of murder (count 1) and assault on a child by means of force likely to cause great bodily injury, resulting in death (count 2). The court denied the motion with respect to child abuse (count 3).

**3.      Petition for a writ of mandate**

On August 13, 2013, the People filed a petition for a writ of mandate in this court, seeking to reinstate the charges of murder and assault on a child by means of force likely to cause great bodily injury, resulting in death.

6

Olmos filed preliminary opposition. On September 27, 2013, we ordered the superior court to show cause why a peremptory writ should not issue. Olmos filed a return, to which the People replied.

## DISCUSSION

### 1. Standard of review

To hold a defendant to answer the charges pleaded in a complaint, the magistrate conducting the preliminary hearing must find probable cause to believe that the defendant has committed the charged offenses. (§§ 866, subd. (b), 872, subd. (a).) Probable cause is shown if a person of ordinary caution or prudence would believe and conscientiously entertain a strong suspicion of the defendant's guilt. (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

Section 995, subdivision (a)(2)(B) provides that an information "shall be set aside" if "the defendant had been committed without reasonable or probable cause." "'On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated.' [Citation.] Neither the trial court in a section 995 proceeding [citations] nor a reviewing court on appeal therefrom [citations] may substitute its judgment as to the weight of the evidence for that of the committing magistrate. 'Although the magistrate, in reaching his decision, may weigh the evidence, resolve conflicts, and give or withhold credence to witnesses, such a balancing of the evidence is not within the powers of a tribunal reviewing the magistrate's order.' [Citation.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*People v. Hall* (1971) 3 Cal.3d 992, 996 (*Hall*).)

"When we review a section 995 motion, we 'disregard[] the ruling of the superior court and directly review[] the determination of the magistrate.' [Citations.] We conduct

7

an independent review of the evidence, but will not substitute our judgment for that of the magistrate as to the credibility or weight of the evidence. [Citing *Hall*, *supra*, 3 Cal.3d at p. 996.] We will not set aside an information 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' (*Ibid.*)" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.)

## 2. Aiding and abetting liability for the charged offenses

Although evidence at the preliminary hearing showed that Olmos herself had a history of hitting Brian, the People's petition for a writ of mandate and additional briefing during the instant writ proceeding clarifies that the People's theory is that Elias inflicted the fatal injuries upon Brian, while Olmos aided and abetted Elias in the commission of the charged offenses.

We therefore summarize the law applicable to aiding and abetting. A person who aids and abets a crime has the same criminal liability as the actual perpetrator. (§ 31; *People v. Montoya* (1994) 7 Cal.4th 1027, 1038–1039.) A person aids and abets the commission of a crime when he or she, with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing, facilitating or encouraging commission of the crime, "'by act or advice aids, promotes, encourages or instigates the commission of the crime.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*).)

An aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage (the target crime), but also of any other crime committed by the person he or she aids and abets that is "the 'natural and probable consequence' of the target crime." (*Prettyman*, *supra*, 14 Cal.4th at p. 261.) An aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed, and need not have any specific intent that is an element of the offense committed. (*Ibid.*)

A particular criminal act is a natural and probable consequence of another criminal act if, under all of the circumstances presented, "'a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably

8

foreseeable consequence of the act aided and abetted'" by the defendant. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ."'" (*Ibid.*) "The precise consequence need not have been foreseen." (*Id.* at p. 927.)

"Generally, failure to prevent a crime is insufficient to establish aiding and abetting liability. But 'aiding and abetting liability can be premised on a parent's failure to fulfill his or her common law duty to protect his or her child from attack.' (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1219 [upholding mother's conviction for murder as aider and abettor based on failure to protect against deadly physical abuse of child in her presence after court order forbade contact with the abuser].) '[A] parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable for the attack if the purpose of nonintervention is to aid and abet the attack.' (*Ibid.*)" (*People v. Ogg* (2013) 219 Cal.App.4th 173, 181 (*Ogg*).)

3.      **Sufficiency of evidence of Olmos's liability for assault on a child causing death (count 2)**

Count 2 of the felony complaint and the information charged Olmos with violating section 273ab, subdivision (a), which provides, "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189."

Olmos's liability as an aider and abettor for violating section 273ab, subdivision (a) could arise from either of two scenarios: (1) she aided and abetted Elias in violating section 273ab, subdivision (a) (assault), or (2) she aided and abetted him in the "target" offense of violating of section 273a, subdivision (a) (child abuse), and was criminally

9

liable for his violation of section 273ab, subdivision (a) (assault) through application of the natural and probable consequence doctrine.

The threshold issue, however, is whether Olmos's conduct constituted aiding and abetting. We conclude the evidence was sufficient to allow the magistrate, acting as a person of ordinary caution or prudence, to conscientiously entertain a reasonable suspicion that Olmos's acts and omissions constituted aiding and abetting.

*Ogg* is directly on point. In *Ogg*, the victim's mother knew that her boyfriend Daniel had previously sexually molested, and was continuing to molest, her daughter A.R., but the mother did not report this to the police or terminate her relationship with Daniel. Instead, the mother married him and discouraged her daughter from reporting the abuse, which continued for ten years. (219 Cal.App.4th at pp. 177–179.) On appeal from her conviction by a jury, the mother argued the evidence was insufficient to establish that she acted with the requisite intent to commit, encourage, or facilitate commission of the crime of continuous sexual abuse of a child. (*Id.* at pp. 179–180.) The appellate court disagreed, stating, "Ogg knew the full extent of Daniel's criminal purpose and, by her inaction, intended to facilitate his sexual abuse. It is a reasonable inference that Ogg, the mother and caretaker of her minor daughter, knew Daniel had molested A.R. and would continue to molest her without intervention. . . . Ogg facilitated the continuing sexual abuse when she kept Daniel in the home, married him, and discouraged A.R. from reporting the abuse." (*Id.* at p. 181.) The court continued, "She both acted and failed to act with the intent to facilitate his abuse. Substantial evidence supports the inference that Ogg chose to facilitate the abuse rather than sever her relationship with Daniel. Moreover, Ogg concealed the abuse by dissuading AR. from reporting it. 'The culpability of a person . . . who, in essence, condones such abusive behavior and then attempts to hide it, thereby compounding the psychological harm to the child, must be as great as that of the perpetrator.' [Citation.]'" (*Id.* at pp. 181–182.) The court further rejected Ogg's claim that she could not be guilty as an aider and abettor because she was not present during the commission of the crimes. (*Id.* at p. 182.)

10

As in *Ogg*, Olmos had been aware that Elias was abusing Brian for at least three months, and probably longer because she avoided taking Brian to the doctor near his first birthday to prevent discovery of the abuse. She admitted she had observed Elias commit violent acts against Brian by pulling his hair, yanking him by the arms, spanking, slapping, shaking, and repeatedly punching him. She knew Elias disliked Brian and that Elias violently assaulted Brian when the child angered Elias, for example, by crying. She knew that Elias's violence had escalated over time from spanking to punching and that Elias was undeterred by her attempts to intervene. She also knew that Elias's violent assaults on Brian left the child with bruises and enduring pain. Yet, as in *Ogg*, she neither reported the abuse to the police nor terminated her relationship with Elias. She instead facilitated Elias's continuing abuse of Brian by continuing to reside with Elias and allowing Elias to be alone with Brian and to abuse him. Olmos not only failed to take Brian for treatment of the injuries Elias inflicted, but also knowingly concealed the abuse by deciding not to take Brian to the doctor for a routine checkup because the doctor would see Brian's bruises.

Also as in *Ogg*, the prosecutor contends that Olmos "both acted and failed to act with the intent to facilitate [Elias's] abuse." (*Ogg*, *supra*, 219 Cal.App.4th at p. 181.) Olmos argues in her return to the petition that she left Brian in the care of Maria, not Elias. Blagg testified, however, that Maria, Elias, and Olmos all lived in the same house, and Olmos clarified that she simply left Brian in his playpen, and Maria was supposed to watch him. Olmos knew that when Elias returned home, he would have unfettered access to Brian. Thus, Olmos was not protecting Brian or shielding him from Elias when she left the child at home in Maria's care.

Drawing every legitimate inference in favor of the information, we necessarily conclude that the magistrate, acting as a person of ordinary caution or prudence, conscientiously could have entertained a reasonable suspicion that Elias violated section 273ab, subdivision (a) (assault) by assaulting Brian by means of force that, to a reasonable person, would be likely to produce great bodily injury and that Olmos

11

intentionally facilitated Elias's aggravated assaults on Brian by continuing to expose Brian to the severe abuse that she knew Elias had been inflicting upon him for at least three months and probably longer.

As noted, Olmos's criminal liability as an aider and abettor alternatively could have been premised upon Elias's violation of section 273a, subdivision (a) (child abuse) with liability for the greater offense of section 273ab, subdivision (a) (assault) resulting from application of the natural and probable consequences doctrine. Thus, the magistrate conscientiously could have entertained a reasonable suspicion that Olmos aided and abetted Elias in committing child abuse in violation of section 273a, subdivision (a), and that assault on a child by means of force likely to produce great bodily injury was a natural and probable consequence of such child abuse, given the particular types of acts Elias perpetrated, such as repeatedly punching Brian with a closed fist, and given that Elias was an adult man and Brian was only about 18 months old.

Accordingly, we conclude that the trial court erred in setting aside the information with respect to the charge of assault on a child by means of force likely to cause great bodily injury, resulting in death.

**4.      Sufficiency of evidence of Olmos's liability for murder**

Count 1 of the felony complaint and the information charged Olmos with murder in violation of section 187, which is sufficient to charge murder in any degree, without further specification. (*People v. Harris* (2008) 43 Cal.4th 1269, 1295.) Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.)

Given the limited evidence introduced at the preliminary hearing, Olmos's liability for murder depends upon both her status as an aider and abettor and application of the natural and probable consequences doctrine to extend her liability from the commission

12

of child abuse or assault.  Drawing every legitimate inference in favor of the information, in light of Brian's extreme youth and the form, extent, and escalation of the physical assaults Elias had been inflicting upon Brian for at least three months, we conclude that the magistrate, acting as a person of ordinary caution or prudence, conscientiously could have entertained a reasonable suspicion that murder was a natural and probable consequence of child abuse or assault on a child by means of force likely to produce great bodily injury, and that Olmos intentionally facilitated Elias's abuse of, and aggravated assault upon, Brian by knowingly continuing to expose Brian to Elias's severe abuse. Accordingly, we conclude that the trial court erred also by setting aside the information with respect to the murder charge.

## DISPOSITION

The petition for a writ of mandate is granted. We direct the superior court to (1) vacate its order granting Olmos's Penal Code section 995 motion to set aside the information with respect to the murder (§ 187) and assault on a child by means of force likely to cause great bodily injury, resulting in death (§ 273ab, subd. (a)) charges, and (2) issue a new and different order denying Olmos's section 995 motion with respect to those two charges.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.