Filed 5/13/14  P. v. Barrientos CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057285 |
| v. | (Super.Ct.No. RIF148667) |
| NANCY PEREZ BARRIENTOS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Patrick F. Magers, Judge.  Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Nancy Barrientos and her three-year-old child, Ismael Galica[1] began cohabiting with Carlos Marquez (called Rudy) in January 2009. Although defendant noticed bite marks, bruises, and marks from a cord on her child, defendant permitted Rudy to watch her child while she worked. Approximately six weeks after moving in with Rudy, Ismael was dead from blunt force injuries inflicted by Rudy, which lacerated his liver and severed the connection between the child's stomach and small intestine. Defendant was charged with murder (Pen. Code,[2] § 187, subd. (a), count 1), assault of a child by means of force likely to produce great bodily injury, resulting in death (§ 273ab, count 2), and torture (§ 206, count 2). After a jury trial, defendant was convicted of involuntary manslaughter (§ 192, subd. (b)), as a lesser offense included in count one, convicted of assault on a child causing death as charged on count two (§ 273ab), and was acquitted of torture as to count 3. Defendant appealed.

On appeal, defendant argues (1) there is insufficient evidence to support the conviction for assault on a child with force likely to produce great bodily injury resulting in death under the prosecution's theory that she aided and abetted the abuse of her child by Rudy, and (2) the court's instructions to the jury on the elements of assault on a child with force likely to produce great bodily injury resulting in death allowed the jury to

---

[1] Ismael's first name is also Carlos, which is also the first name of Ismael's biological father. To avoid confusion, we refer to the child as Ismael, his father as Carlos, and the killer of the child as Rudy.

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

convict without finding all of the elements of that offense under the prosecution's theory. We affirm.

## BACKGROUND

Carlos Ismael Galica (Ismael) was born on January 28, 2006. The defendant and Ismael's father, Carlos Galica, separated when Ismael was one year old, after an unstable relationship, and defendant moved back with her family. In March 2008, defendant and Ismael moved in with defendant's older sister, Diana. In 2008, defendant went to work at a fast food restaurant, where Diana, as well as her younger sister Lorena, her cousin Luis and his girlfriend Monica, also worked. During 2008, while defendant worked, Ismael was cared for by defendant's mother or sister.

Defendant met Rudy Marquez[3] in August 2008 while working at the fast food restaurant and by October of that year, they started seeing each other. Because Diana's husband had spanked Ismael, defendant decided to move out. Rudy helped defendant find an apartment in Corona and defendant moved in with him in January 2009. Rudy was not working, so he said he would take care of Ismael. Rudy did not want anyone to know where they lived.

After defendant moved in with Rudy, Ismael's father called to request a visit with his son, and when defendant told him he could not have a visit, the child's father threatened to seek custody of his son. Rudy got violent with defendant after that call.

---

[3] Rudy Marquez was apparently a nom de plume. He had several birth certificates under various names, but his true name was apparently Juan Carlos Roman.

Subsequently, neither the child's father nor defendant's family were permitted to see the child. Defendant became more distant, and did not bring her son around the restaurant or talk about him as she did previously.

On February 8, 2009, defendant was in an automobile accident, which left her without a car or her cell phone. On the day of the accident, Rudy called his mother, Rosio Roman, and asked her to watch the child. Rosio and her teenage daughter Maribel met Rudy at a liquor store near a fast food restaurant to pick up the child. Rosio and her daughter met Rudy at that location because Rosio was afraid of her son and did not want Rudy to know where they lived. Rudy had been kicked out his mother's house several years earlier. Rudy had been to prison and had a history of using cocaine. Maribel noticed a big bite on Ismael's shoulder. Maribel and her mother applied a medicated cream or ointment to the bites. Rudy picked up the child that night.

The next day, the child came back to Rudy's family's home. Rudy's younger sister, Maribel, noticed that Ismael had bruises and bites on him. While at Rosio's home, Maribel played with Ismael and gave him a bath. Maribel noticed a lot more bites on Ismael's back, stomach and leg, as well as a mark that resembled a big "W" on the inside of the boy's right thigh, that was open, like a cut. Rosio and Maribel applied more cream on these injuries. That night, at 9:00 p.m., they took Ismael back to the liquor store where Rudy picked him up. Ismael did not want to go with Rudy.

Rudy dropped off Ismael to stay with his mother for the weekend of Valentine's Day, 2009. The couple also had a small party with Monica and Luis for defendant's 21st

4

birthday on Sunday, February 15th.  At the party, alcohol was consumed by all, and, in addition, Rudy snorted cocaine.  Defendant wanted Ismael to stay at Rosio's home until the following Wednesday, when Rudy planned to leave for Mexico.  By this time, defendant had noticed the bites and bruises on her son, had been informed that Rudy had sodomized Ismael, and she had been punched herself by Rudy.

However, on Monday, February 16th, while defendant was at work, Rudy picked up Ismael in the afternoon.  At around 7:00 or 7:30 p.m., Rudy called defendant at the fast food restaurant to tell her there was a problem and that she should come home.  A few minutes later, he called again to report that Ismael was not breathing and that she needed to come home immediately.  Defendant contacted her employer to report that she had to leave for a family emergency, and Monica, who worked the same shift, drove defendant to her apartment after they closed up the restaurant.

At the apartment, defendant found Ismael on the living room floor, dressed in his clothes and covered with a blanket; his lips were turning purple.  Defendant tried to uncover and undress the child to check him, but Rudy told her to wait for the paramedics.  However, Rudy had not called 911 yet, and when he did call, he gave the dispatcher the wrong address, and indicated that the child had fallen in the bathtub or shower.

Emergency personnel located the apartment despite the misdirection and arrived within 10 minutes.  They noticed the child was not wet, and that there were bite marks and bruises, in various stages of healing, all over the child.  One of the emergency responders asked defendant about the bite marks, and she explained they were play bites

5

and that she was responsible for them. Initially Ismael was responsive, but his condition deteriorated. Ismael was transported to Corona Regional Medical Center. Ismael died of severe blunt force abdominal trauma, which resulted in a two-inch laceration of the liver, as well as a laceration to the junction between the stomach and the small intestine, resulting in a seventy-five percent tear to the structure. There were knuckle marks on the body consistent with the injury to the liver.

After the emergency personnel had left the apartment with Ismael, Rudy got rid of some cocaine that was in the apartment. Defendant and Rudy left in Rudy's car, and attempted to determine to which medical facility Ismael had been taken by going to the nearest one first. However, at Corona Regional Medical Center, Rudy saw police cars outside and refused to stop; he called Monica to meet them, in order for Monica to take defendant to the hospital.

At the hospital, Detective Voorhees interviewed defendant. Defendant told the detective that she and her boyfriend had picked up her son at 7:00 p.m. and had driven straight home. She explained that she went in to give Ismael a shower while Rudy washed the dishes, and that she stepped out of the bathroom for a few minutes. When she returned, Ismael was in the tub, and was having trouble breathing. She then explained that she took the child out of the tub and into the living room, and that she told Rudy to call 911. When asked about the bite marks, defendant stated that she had bitten the child on a few occasions in a playful manner, a few weeks earlier.

6

In a subsequent interview, defendant was shown a photograph of her son, which depicted 12 bite marks. Defendant initially identified four bites that she had inflicted, but later admitted that her boyfriend admitted biting her child, and that Ismael had told her that Rudy bit him. Defendant also admitted responsibility for curvilinear marks found on Ismael's body, explaining that she had disciplined him for defecating in his pants.

Defendant was arrested and transported to the police station where she was read her rights[4] and allowed to sleep for several hours. Initially, defendant told the detective the same story she had told the night before in the hospital. However, at some point, defendant asked the detective if he could protect her, and went on to explain that Rudy had inflicted the injuries while she was at work, and that she was afraid he would harm her, or her family.

Defendant was charged with murder (§ 187, subd. (a), count 1), assault of child by force likely to produce great bodily injury, resulting in death (§ 273ab, count 2), and torture (§ 206). Following a trial by jury, defendant was acquitted of murder and torture. However, she was found guilty of involuntary manslaughter (§ 192, subd. (b)), a lesser included offense within the charge alleged in count 1, and was convicted of count 2, assault causing the death of a child. (§ 273ab.) The court denied probation and committed defendant to state prison for 25 years to life for count 2, the violation of section 273ab. The court stayed a midterm sentence of three years for count 1 pursuant to section 654. Defendant timely appealed.

---

[4] She was admonished per *Miranda v. Arizona* (1966) 384 U.S. 436, 467-468.

**DISCUSSION**

1.      *There Is Substantial Evidence to Support the Conviction of Assault On a Child By Force Likely to Produce Great Bodily Injury Resulting in Death.*

Defendant contends that her assault on a child with force likely to produce great bodily injury resulting in death conviction must be reversed because the prosecutor's theory by which appellant could be found guilty of this offense was not supported by substantial evidence. Acknowledging that there was evidence to support a finding that she herself had committed a felony child endangerment (abuse) offense by allowing Rudy to continue to babysit Ismael, even though he had been violent to her and Ismael, she asserts there was no evidence she had aided and abetted Rudy in the commission of a separate child endangerment offense by Rudy hitting and biting Ismael, because there is no evidence she knew that Rudy intended to commit the violent act or that she intended to aid him in its commission. We disagree.

We begin with a recitation of the applicable standard of review. In reviewing a sufficiency of evidence claim, our role is limited; we determine whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is unwarranted unless it appears that upon

8

no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Mason* (2006) 140 Cal.App.4th 1190, 1199.)

Substantial evidence must be of ponderable legal significance, reasonable in nature, credible and of solid value. (*People v. Concha* (2008) 160 Cal.App.4th 1441, 1451.) While we must ensure that the evidence is reasonable, credible and of solid value, it is the exclusive province of the judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. (*People v. Smith, supra,* 37 Cal.4th at p. 739.) While the jury must agree unanimously the defendant is guilty of a specific crime, there is no requirement that the jury unanimously agree on the same theory of guilt. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132, citing *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1026.)

As defined by Penal Code section 273ab, the crime of child abuse resulting in death has four elements: (1) the person had the care or custody of a child under eight years of age; (2) that person committed an assault upon the child; (3) the assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury; and (4) the assault resulted in the death of the child. (*People v. Albritton* (1998) 67 Cal.App.4th 647, 655.) The crime defined by section 273ab is neither a murder statute, nor a felony murder statute; it is an assault statute. (*People v. Norman* (2003) 109 Cal.App.4th 221, 227.)

An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense.

9

(*People v. Avila* (2006) 38 Cal.4th 491, 564.)  An aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets.  (*People v. Whalen* (2013) 56 Cal.4th 1, 59.)  Although the defendant must share the perpetrator's specific intent when aiding and abetting a specific intent crime (See *People v. Houston* (2012) 54 Cal.4th 1186, 1224), aiding and abetting a general intent crime does not require a specific intent or an accompanying instruction to that effect.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1380.)

Additionally, while it is ordinarily true that mere presence at the scene of a crime, mere knowledge that a crime is being committed, and the failure to prevent it, do not amount to aiding and abetting (CALCRIM No. 401; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103), a failure to act can constitute aiding and abetting if the aider and abettor has a legal duty to act.  (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744, citing *People v. Culuko* (2000) 78 Cal.App.4th 307, 331, fn. 7.)  "'Although the law does not generally require an individual to come to the aid of another, certain relationships exist which require such action.  Criminal conduct may arise not only by overt acts, but by an omission to act where there is a legal duty to do so.'"  (*People v. Ogg* (2013) 219 Cal.App.4th 173, 182, quoting *People v. Stanciel* (1992) 153 Ill.2d 218, 236.)

In California, parents have a statutory duty "to exercise reasonable care, supervision, protection, and control over their minor child."  (§ 272, subd. (a)(2).)  In

addition, California recognizes a common law duty on the part of parents to protect their children. (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1212, citing *People v. Heitzman* (1994) 9 Cal.4th 189, 198.) In light of the duty of parents to protect their children, defendant may be liable for their children's homicides, as aiders and abettors, based on their failure to protect them from abusive boyfriends. (*People v. Rolon, supra,* at p. 1216, citing *People v. Swanson-Birabent, supra,* 114 Cal.App.4th at p. 745.)

Here, defendant had a duty to protect her three year old child. She knew Rudy had been abusing Ismael because of bruises and bite marks that no reasonable person could believe were accidental, and because her son so informed her. In the days preceding the fatal beating, defendant and others saw bruises towards Ismael's bottom, bite marks and bruises on his back, legs and stomach, an open wound in the shape of a W or M on his thigh caused by some sort of electric cord or cable, and large purple bruise on his left cheek.

The abuse was continuous and escalating during the brief time that defendant and Ismael lived with Rudy. It was not merely reasonably foreseeable that a fatal injury would be inflicted; it was probable under the circumstances of this case. Nevertheless, defendant took no protective action on behalf of her son, thereby aiding and abetting Rudy's abuse of Ismael. The jury was instructed as to the elements of the crime and the applicable theories of principal liability. There is substantial evidence to support the judgment.

2. *The Instructions Relating to the Charge of Assault on a Child With Force Likely to Produce Great Bodily Injury Resulting in Death Were Proper.*

Defendant argues that the court erred when it gave instructions that allowed the jury to find her guilty of the crime of assault on a child with force likely to produce great bodily injury resulting in death without finding all the elements of that offense under the prosecutor's theory of prosecution. Specifically, defendant complains that the trial court failed to read "the last two paragraphs in the standard version of CALCRIM 403."

We agree with the general premise that a trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Blair* (2005) 36 Cal.4th 686, 744-745 [overruled on a different point in *People v. Black* (2014) 58 Cal.4th 912, 919].) These general principles of law include the elements of the charged offenses. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.)

First, the omission of the two paragraphs complained of was not error. Those paragraphs addressed situations in which there is more than one target offense, and one of the crimes is alleged to be the natural and probable consequence of the crime that the defendant aided and abetted. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 267-268.) Under these circumstances, the court must identify and describe for the jury any target offense allegedly aided and abetted by the defendant. (*Id.,* at p. 268.) Insofar as only one target offense was involved here, there was no need to read the last two paragraphs of CALCRIM No. 403.

Defendant also argues that, as instructed, the jury could have found her guilty of assault on a child by force likely to produce great bodily injury resulting in death without finding all of its elements under the prosecutor's theory of prosecution, by which the jury would have had to find that defendant aided and abetted Rudy in the commission of a child abuse (endangerment) offense. She claims that the version of CALCRIM No. 403 that was given did not require the jury to find that defendant aided and abetted Rudy in the commission of any crime, and that under the instruction given, the jury could find her guilty of violating section 273ab without finding she aided and abetted Rudy in the commission of any crime.

The court read CALCRIM Nos. 400 and 401, explaining the concept of aiding and abetting the commission of a crime, before instructing on any of the specific crimes. The jury was thus admonished that defendant could be guilty as a perpetrator or as an aider and abettor. The court also read CALCRIM No. 820, correctly setting out the elements of the crime of assault causing the death of a child. Those elements included the commission of an act that by its nature would directly and probably result in the application of force to the child, and that the defendant did that act willfully. Under the aiding and abetting instructions given, the defendant could be found guilty of the crime in one of two ways: as the perpetrator, or as an aider and abettor.

The court also admonished the jury to consider the instructions as a whole. (CALCRIM No. 200.) Jurors are presumed to be intelligent persons capable of correlating and following the instructions. (*People v. Martin* (2000) 78 Cal.App.4th

13

1107, 1111.) When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation, but, rather, in the context of the overall charge. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075, citing *People v. Mayfield* (1997) 14 Cal.4th 668, 777.)

In addition to correct explications of the principles relating to aider and abettor liability and the elements of the crime of assault causing death of a child, the jury was also instructed elsewhere, "A parent has a legal duty to care for a child. [¶] If you conclude that the defendant owed a duty to Carlos Ismael Galacia [*sic*], and the defendant failed to perform that duty, her failure to act is the same as doing an injurious act." This statement reflects the current state of the law holding that aiding and abetting liability can be premised on a parent's failure to fulfill his or her duty to protect his or her child from attack. (*People v. Rolon, supra,* 160 Cal.App.4th at p. 1219; *People v. Culuko, supra,* 78 Cal.App.4th at p.331, fn. 7.)

Finally, the prosecutor emphasized during summation that the People's theory of liability for assault on a child resulting in death was that defendant aided and abetted Rudy's assault.

Reading the instructions as whole, as the jurors are instructed to do and as appellate courts must do, they did not allow the jury to convict defendant of child abuse homicide without finding that she aided and abetted Rudy's violent abuse of Ismael.

### DISPOSITION

The judgment is affirmed.

14

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAMIREZ</u>
P. J.

We concur:

<u>McKINSTER</u>
J.

<u>KING</u>
J.