Filed 4/18/16  P. v. Jackson CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEX DONALD JACKSON,<br><br>    Defendant and Appellant. | B259906<br><br>(Los Angeles County<br>Super. Ct. No. MA059722) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed as corrected.

The Severo Law Firm and Michael V. Severo for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Nathan Guttman, Deputy Attorneys General for Plaintiff and Respondent.

_____

Appellant Alex Donald Jackson appeals from the judgment entered after his jury conviction of second degree murder with malice aforethought (Pen. Code, § 187).[1] He raises three principal issues: (1) whether there was instructional error; (2) whether substantial evidence supports the verdict; and (3) whether there was juror misconduct. We find if there was error, it was not prejudicial, and affirm the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

On May 9, 2013, the victim Pamela Devitt was taking her morning walk in Littlerock, when she was attacked by four pit bulls. A witness saw the victim on the ground, surrounded by the pit bulls, and called 911. When sheriff's deputies responded to the scene, one of the dogs was still biting the victim, but as the deputies came closer, that dog ran off into the desert. Deputies observed that the victim had puncture wounds on both arms and legs and her scalp had been torn back. When the paramedics arrived shortly afterwards, the victim was surrounded by a large amount of blood but was no longer actively bleeding. The paramedics determined she needed to be transported to the hospital immediately for a blood transfusion. She died on the way to the hospital.

Appellant lived with his mother, on a two acre lot, on 115th street in Littlerock. The incident occurred a few blocks from his house. One of the responding deputies remembered a prior incident when appellant's pit bulls had attacked horse riders and decided to go to his house to look for the pit bulls. When the deputies made contact with appellant, he told them he did not have any pit bulls and refused to allow them to check his house. After the deputies obtained a search warrant, four dogs were found inside his house (these four were later determined to not have been involved in the incident), and the four pit bulls involved in the attack were found in appellant's garage. The four garage pit bulls had blood on their fur and DNA evidence established that the victim's blood was found on each of them.

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

Appellant had a history of taking in stray dogs dumped in the desert. Prior to the victim's death, dogs from appellant's house were involved in at least five or six incidents involving humans and horses. Elbert Walden worked as a United States Postal Service (USPS) rural carrier and appellant's house was on his route. One day in March 2012, as he drove up to appellant's mailbox, a pit bull on the outside of the fence began barking and jumping on his vehicle. Walden decided not to deliver the mail, and as he tried to drive away, the dog bit the front and back bumper of his mail truck. A "dog letter" was sent to appellant's house, notifying the occupants that if they did not keep their dogs inside between the hours of nine in the morning and six in the evening, USPS would discontinue mail delivery. Appellant signed and returned the letter and the USPS continued to deliver mail without any subsequent problems.

In January 2013, Epifanio Maldonado and Eladio Lopez were riding their horses past appellant's house. Appellant was standing outside his property, accompanied by five to 10 pit bulls.[2] The dogs started barking and chasing the horses. Appellant called the dogs but they did not return to him. The dogs bit the horses and Maldonado's horse kicked one of the dogs. Appellant then threw rocks toward Maldonado. Maldonado's boots were bitten by the dogs and both horses sustained bite injuries on their legs. Maldonado called 911 after the incident and an officer responded to appellant's house, informing him that if the riders wanted him to pay for any medical treatment the horses might need, appellant would be responsible. Appellant was upset that Maldonado and Lopez were riding their horses down his street because he thought it was a private road (the street is a dirt road that appellant and his neighbors maintain). Approximately a week after this incident, an Animal Care and Control officer responded to appellant's home regarding the complaint from Maldonado. The officer saw two pit bulls in appellant's yard. Appellant was inside and came out to speak with the officer. He told

---

[2]   Maldonado testified that there were five or more dogs. Lopez testified that there were somewhere between eight and 10 dogs.

3

the officer that his yard was secure and that his dogs had not gotten out. He went on to say, "I know there [are] reports of pit bulls that are in the area, and they are not mine." The officer noted that the two pit bulls in the yard were "very friendly" but cited appellant for not having them licensed. The officer did not see any other dogs at that time and after inspecting the fence, he noted that the fence looked secure.

On April 3, 2013, Cheree Crisp was riding her horse by appellant's house. She testified that five pit bulls came through an opening in the fence and started biting her horse. One of the dogs jumped on the back of her horse, causing the horse to buck her off. The dogs continued to bite her horse so she let the reins go and the horse ran off. The dogs chased the horse and Crisp ran to a neighbor's house. The neighbor drove her back to her own house. Crisp and her friend Ronda Mortimer then went to find her horse and later called the sheriff's department. A deputy responded and took the report, but the record does not indicate whether the deputy followed up with appellant. Mortimer went to appellant's house the next day and told him her neighbor had been attacked by his pit bulls. Appellant claimed he did not have any pit bulls. Crisp sustained a bite mark to her right calf and her horse had gashes on its back legs and skin missing from its nose and mouth.

Towards the end of April 2013, Adalberto Farias was riding his horse by appellant's house when appellant's dogs started barking. He saw one dog jump the fence and then three others followed. He rode away and the dogs chased him but did not catch up to his horse. A week later Farias rode by appellant's house again and the dogs again chased him but stopped following him after 400 or 500 feet. After the second incident, Farias stopped by the home of appellant's neighbor, Richard Torrez. Torrez was outside his house and Farias told him that appellant's dogs had gotten loose and chased him. Farias told Torrez that if appellant needed more fencing, he had some extra chain-link fencing and gave Torrez his address. Later, when appellant was driving past Torrez's house, Torrez told him that a person on his horse was angry about appellant's dogs getting out and said he had extra chain-link fence if appellant needed it.

4

On approximately May 2, 2013, Karla Rosales and Rodrigo Rodriguez were riding tandem on their horse past appellant's house. Appellant's dogs started barking and then two came out onto the street, followed by four others. Rosales testified that all six dogs looked like pit bulls, that they were biting at the horses' legs, and they bit the shoelace on Rosales' boot. She also testified that she saw appellant standing outside of his house but that he did nothing to stop the dogs. Rodriguez, who was sitting behind her on the horse, did not see appellant during the incident. Rosales and Rodriguez were able to ride away without sustaining any injuries, but their horse had bite marks on its leg.

Gloria Smith and Xavier Villegas moved into a house across the street from appellant in April 2013. Their mailbox was located in front of appellant's house, next to his mailbox. Smith testified that she wanted to move her mailbox to her side of the street because she often arrived home late at night and appellant's dogs made her nervous. Once she saw one of the dogs jumping appellant's fence and took a picture so that the USPS would allow her to move her mailbox. She testified that appellant's dogs had not been aggressive with her but that generally she was afraid of big dogs. Villegas testified that they had had no problem with appellant's dogs but then the prosecutor played a portion of a taped interview with Villegas in which he told the investigator that when they first moved in, the dogs had "rushed, they were attacking me and my wife and our dog." In the taped interview, he also told the investigator he would use a pellet gun to keep the dogs away and that he carried a machete with him when he walked across the street to retrieve his mail.

Appellant testified that in 2012 and again in early 2013, he added fencing to his picket fence to make it more structurally sound and to prevent his dogs from getting out. Most, if not all, of the attacks occurred after the time that appellant claims the fence repairs were made.

On May 9, 2013, after Animal Care and Control officers removed the dogs from appellant's home, sheriff's deputies discovered a marijuana growing operation in appellant's bedroom, a firearm, and psilocybin (a hallucinogenic mushroom). Appellant

5

was charged with murder (§ 187, subd. (a)), custody or control of a mischievous animal causing death or serious bodily injury (§ 399, subd. (a)), assault with a deadly weapon based on throwing a rock at Maldonado (§ 245, subd. (a)(1)), cultivating marijuana (Health & Saf. Code, § 11358), possession of marijuana for sale (Health & Saf. Code, § 11359), and possession for sale of a controlled substance (psilocybin) (Health & Saf. Code, § 11378). Prior to trial, the count for a mischievous animal causing death or seriously bodily injury was dismissed. After a jury trial, appellant was found guilty on all counts, except the count for assault with a deadly weapon. Appellant was sentenced to seven years for the drug offenses and 15 years to life for the murder conviction.[3]

This timely appeal followed.

## DISCUSSION

### I

Appellant argues the court erred in instructing the jury on the elements of second degree murder and therefore we must reverse, unless we conclude beyond a reasonable doubt that the error did not contribute to the verdict. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)[4] We conclude the jury was properly instructed on the elements of second degree murder.

The second degree murder instruction given to the jury required the People to prove beyond a reasonable doubt that: (1) "The defendant committed an act or failed to do a required act that caused the death of another person;" and (2) "When the defendant

---

[3] As discussed in section IV, the court issued a separate abstract of judgment for the determinate sentence and the indeterminate sentence. Neither abstract reflects the court's oral pronouncement that the determinate sentence shall run concurrent to the indeterminate sentence.

[4] Appellant acknowledged that he was raising this issue for the first time in his reply brief but urged that we consider it because the failure to raise it may constitute a claim for ineffective assistance of counsel. We invited respondent to address the instructional error argument and respondent submitted a reply letter.

acted or failed to do a required act, he had a state of mind called malice aforethought." Appellant argues there was instructional error because the court inserted the language "or failed to do a required act" to CALCRIM No. 520, without instructing the jury that appellant had a legal duty to act.

"[W]hen an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 197 (*Heitzman*)). The existence of a legal duty is a matter of law to be decided by the court. (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 819.) The bench notes to CALCRIM No. 520 explain that "[i]f the prosecution's theory of the case is that the defendant committed murder based on his or her failure to perform a legal duty, the court may give the bracketed portion that begins, '(A/An) *<insert description of person owing duty>* has a legal duty to.'" The note then references the bench notes to CALCRIM No. 582 for involuntary manslaughter based on a failure to perform a legal duty. That note provides that "[t]he court should instruct the jury if a legal duty exists. (*People v. Burden* (1977) 72 Cal.App.3d 603, 614.)"

It is unclear from the record whether the prosecution's theory of the case was premised on an intentional act or an intentional failure to act—the prosecutor argued both that the defendant committed an intentional act by keeping the dogs when he knew the dogs were dangerous and were getting out and attacking passersby and that the defendant knew his dogs were dangerous and failed to "get rid of the dogs or keep the dogs safely confined." The addition of the phrase "or failed to do a required act" to the CALCRIM No. 520 instruction, reflects a trail court determination that a legal duty was requisite to its theory. The instruction would have been more complete had the court explicitly instructed the jury on the legal duty appellant owed the victim, but if the failure to do so was error, as appellant contends, we are satisfied that the error was harmless under the *People v. Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

7

"When a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere. [Citation.]" (*Heitzman*, *supra,* 9 Cal.4th at p. 198.) A criminal statute may incorporate a duty imposed by another criminal or civil statute, and "may also embody a common law duty." (*Ibid*.) This court explained in *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1216, "[t]o recognize that a criminal statute may embody a common law duty to act, as *Heitzman* does, is not to impose criminal liability without a statute. The statute is still the source of liability; the common law only provides the rationale that failure to act can be equivalent to an affirmative act in some situations."

If an animal, creates a foreseeable risk of injury to others, the owner "has a duty to anticipate the harm and to exercise ordinary care to prevent the harm. [Citation.]" (*Drake v. Dean* (1993) 15 Cal.App.4th 915, 929.) The common law provided "'that the owner of an animal which was not vicious'" would be liable if, the owner had knowledge of the animal's propensity for harmful behavior and failed to exercise reasonable control of the animal. (*Ibid*; see also Rest.2d Torts, § 518 [owners of domestic animals have duty to exercise reasonable care to have animals under constant and effective control].) Accordingly, the common law has provided a rationale for why appellant's intentional failure to confine pit bulls with dangerous propensities is the equivalent of an affirmative act.

Assuming there was error, it was that the court neglected to instruct the jury that failure to perform an act one has a legal duty to perform can satisfy the *actus reus* element of second degree murder. This type of error is properly reviewed under the "'miscarriage of justice'" standard of article VI, section 13 of the California Constitution and is not reversible unless there is a reasonable probability that the defendant was prejudiced as a result of the error. (*Watson, supra,* 46 Cal.2d at p. 836; see also *People v. Aranda* (2012) 55 Cal.4th 342, 375 [failure to provide definition of reasonable doubt standard reviewed under *Watson* harmless error standard].)

8

While the court did not expressly instruct on appellant's duty as a dog owner, appellant was not prejudiced by the failure. The evidence established that appellant had notice his dogs were jumping over his fence, attacking passersby, and that he failed to exercise ordinary care by failing to remedy the situation. In closing, the prosecutor argued to the jury that "[i]t is the owner's job to keep us safe[,]" when the owner knows that his dogs are dangerous, and have attacked people. Thus, in the absence of the assumed error—the failure to define the relevant duty in the murder instruction—it is not reasonably probable that a different result would have been reached. The evidence left no doubt that defendant owed a duty to take reasonable precautions to control his dangerous dogs, that he failed to do so, and that his failure caused the victim's death.

Additionally, appellant argues that insertion of the language "failure to perform a required act" confused the jury because this language also was the basis for the first element of involuntary manslaughter. The murder and involuntary manslaughter instructions both contained "failure to act" language, but in the second degree murder instruction this language was relevant to the *actus reus* element: whether "[t]he defendant committed an act or failed to do a required act that caused the death of another person." The murder instruction also required the jury to find that the defendant acted with the requisite *mens rea*: malice aforethought, that "[h]e deliberately acted with conscious disregard for human life." Any confusion could not have been prejudicial because the *mens rea* element required a finding of a higher degree of culpability, thus clearly distinguishing second degree murder from involuntary manslaughter.

II

We next address the sufficiency of evidence argument. In determining whether the evidence in a criminal case is sufficient to support a verdict, the test is "'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of

9

every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The test is not whether the evidence establishes guilt beyond a reasonable doubt but whether the evidence could persuade a reasonable jury to find guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

We conclude there is substantial evidence to support the verdict for the same reasons that any instructional error was harmless. Regarding the first element of second degree murder, the jury reasonably found that appellant "committed an act or failed to do a required act that caused the death of another person." Appellant knew his dogs were jumping his fence and attacking passersby. As an owner of animals with dangerous propensities, appellant had a duty to exercise reasonable care in keeping his dogs from jumping the fence, and his failure to do so caused the death of another person.

The jury also reasonably found that appellant acted with malice aforethought. Under the malice aforethought instruction, the jury was required to find that appellant acted with implied malice if: (1) "He intentionally committed an act or failed to do a required act;" (2) "The natural and probable consequences of the act or failure to do a required act were dangerous to human life;" (3) "At the time he acted or failed to do a required act, he knew his act or failure to do a required act was dangerous to human life;" and (4) "He deliberated acted with conscious disregard for human life."

In this case, the requirement of intent to commit an act or intentional failure to do a required act element was satisfied by the following evidence: appellant's awareness of the attempted attacks by his dogs; awareness that his fence was inadequate to keep the dogs from reaching persons who came close to the property; related failure to take any other steps from preventing the dogs from jumping over the fence; efforts to hide the dogs; denial of owning them; and motive for doing so—his illegal marijuana operation on the property. The natural and probable consequences of his failure to keep his dogs from jumping the fence were dangerous to human life was shown by evidence that when the dogs jumped the fence, they attacked horseback riders, and then on May 9, 2013, the

10

dogs fatally attacked the victim. Appellant knew his failure to keep the dogs from jumping his fence was dangerous to human life because he was on notice the dogs had caused injuries to the horses, and on at least one occasion, to a rider. Finally, it is reasonable for the jury to have found that appellant acted with conscious disregard for human life. He was on notice that the pit bulls had attacked horseback riders, he knew his failure to keep the dogs from jumping the fence was dangerous to human life, and still he made a deliberate decision to do nothing. Because he was engaged in an illegal activity, he had a reason to keep people away from his property. Furthermore, there is evidence he was trying to hide the fact that he had pit bulls and at times denied he had pit bulls, which shows his consciousness of guilt.

III

Finally, we address appellant's juror misconduct argument. "The trial court has discretion to determine whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) "Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 604.) "We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct. [Citations.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1216.)

After the verdict but before sentencing, the court received a note from the foreperson expressing concern that the instruction regarding whether a jury could be hung on the murder count was not read aloud. She also believed some "'forces on the jury . . . may have pressured [two jurors] into switching their vote'" and that if the instruction had been read aloud they might have not switched their vote. There was also a concern that at the beginning of deliberations, one juror said that the jury just needed a

11

vote of guilty on all counts so they could get it over with and that there were no real deliberations with that juror. The court ensured that both counsel received a copy of the letter and addressed the letter at the sentencing hearing.

At the sentencing hearing, the court noted that the letter was hearsay, that the foreperson's concerns were based on speculation, and that statements referring to a juror's mental process are not admissible under Evidence Code, section 1150.[5] Accordingly, the court found that a prima facie case had not been made for petitioning for access to the fellow jurors and that there was not a substantial likelihood that the prejudice, if any, would have impacted appellant's right to a fair trial.

The only information the court had before it to support a finding of juror misconduct was an unsworn hearsay letter written by the jury foreman. "[O]rdinarily a trial court does not abuse its discretion in declining to conduct an evidentiary hearing on the issue of juror misconduct when the evidence proffered in support constitutes hearsay. [Citation.]" (*People v. Dykes*, *supra*, 46 Cal.4th at p. 810; see also *People v. Von Villas* (1992) 10 Cal.App.4th 201, 252-253 [unsworn letter of foreperson did not constitute admissible evidence for purpose of showing juror misconduct].) Even though the letter was hearsay, the court still considered the substance of the letter and found that none of the allegations warranted further inquiry. In fact, as the court correctly found, the instructions had been read aloud to the jury and they also received a written copy. Regarding the deliberation concern, the juror's statement at the beginning of deliberations that the defendant was guilty is not sufficient evidence to show that the juror thereafter refused to deliberate.

---

[5] Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

We find no abuse of discretion.

## IV

In the event of a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the trial court's oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We may correct clerical errors in the abstract of judgment. (*Id*. at p. 186.)

In its oral pronouncement of judgment, which is reflected in the reporter's transcript, the court ordered the seven year determinate sentence for appellant's drug offenses run concurrent to the 15 years to life sentence for murder (count one). The court issued two abstracts of judgment, one for the determinate sentence and one for the indeterminate sentence. Neither reflects the court's oral pronouncement that the determinate sentence run concurrent to the indeterminate sentence. We presume that the court reporter accurately reported the proceedings at the sentencing hearing. (*People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6.) Accordingly, we direct the trial court to correct the abstracts of judgment to reflect that the determinate sentence of seven years is to run concurrent to the indeterminate sentence of 15 years to life.

## DISPOSITION

The judgment is affirmed. The superior court is directed to prepare a corrected abstract of judgment, consistent with the court's oral judgment, and forward it to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

COLLINS, J.