Filed 2/9/24  P. v. Zechlin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMANTHA ZECHLIN,<br><br>    Defendant and Appellant. | C097504<br><br>(Super. Ct. No. 17FE022432) |

Defendant Samantha Zechlin appeals her conviction for felony child endangerment and the jury's finding that she willfully caused or permitted her daughter to be injured and the injury resulted in death.  Defendant contends the trial court denied her due process when it declined to give the jury a pinpoint instruction.  Her theory was that her behavior was reasonable in light of the circumstances.  The pinpoint instruction would have informed the jury that parents need not risk death or great bodily injury to

1

protect a child, and that the relative size and strength of the involved parties was relevant to determining what is reasonable.

We affirm the judgment because the elements of the pinpoint instruction were given to the jury through the instruction on the defense of duress. Thus, any error in refusing to give the pinpoint instruction was harmless beyond a reasonable doubt.

## FACTS AND HISTORY OF THE PROCEEDINGS

A.      Prosecution

1.      The incident

In fall 2017, defendant and her two-year-old daughter, Gabriella, moved in with Frederic McDonald and lived in his apartment. McDonald was an acquaintance and was not defendant's boyfriend. At the time, defendant was engaged to Gabriella's father, R.J. Defendant is 4 feet 10 inches tall and weighed approximately 95 pounds at the time. McDonald was estimated to be 5 feet 8 inches tall and approximately 150 pounds.

On November 20, 2017, a neighbor of McDonald, Suzan L., heard "boom, boom, boom," and then heard someone say, "She's in cardiac arrest. Someone call 911." Suzan called 911 and went out to see what was happening. An older man, later identified as defendant's father, V. Zechlin, was putting Gabriella on the ground. He swept out her mouth with his fingers and began rescue breathing. Suzan kneeled down next to Gabriella. The girl's body was cold, and she had bruising on her face. At V. Zechlin's demand, Suzan began performing chest compressions on Gabriella while he continued performing rescue breathing. Defendant did not try to render aid.

Paramedics arrived. They moved Gabriella to the ambulance where Captain Adrian Watson assisted with CPR. Gabriella did not have a heartbeat, and there was lividity and mottling on her face and chest. Other responders detected rigor in her legs. She was transported to the hospital where she was pronounced dead.

2

2.      Investigation

Captain Watson spoke with defendant at the hospital.  Defendant said that Gabriella awoke at 3:00 a.m. that morning, and McDonald rocked her back to sleep.  At 10:30 a.m., defendant went in and found Gabriella not breathing, and she called 911.  Defendant showed no outward emotion at the scene or at the hospital.

Detective Nathan Traxler also spoke with defendant at the hospital.  He had seen the facial and neck bruising on Gabriella's body.  Defendant told him that Gabriella woke up crying around 3:00 a.m.  Defendant and McDonald gave her a sandwich and some water, and McDonald rocked her back to sleep.  Later that morning, they found Gabriella in distress.  They assumed she might have choked on her sandwich.  McDonald called 911 and started performing compressions.  Defendant called her father.

Defendant told Detective Traxler that Gabriella had a couple of small bruises on her shoulder.  She got those from falling off her bed and squeezing her doll too tight.  A week earlier, Gabriella gave herself a black eye by unintentionally hitting herself with a cup during a tantrum.  Defendant said that she and McDonald bickered a lot and had disagreements, but there was no physical violence in the home.

Law enforcement searched McDonald's apartment that afternoon.  They found a glass pipe in the master bedroom that was the type commonly used to smoke methamphetamine.  Law enforcement also retrieved McDonald's cell phone.  The phone had been used to surveil and video record Gabriella in her bedroom.  One video segment, created at approximately 9:45 p.m. on November 19, 2017, the night before Gabriella's death, depicted extreme physical abuse being inflicted upon Gabriella.  Photographs taken by McDonald's phone on November 17, 2017, also depicted extensive bruising to Gabriella's face and neck.

Following an autopsy, forensic pathologists determined that Gabriella died of blunt force injuries and asphyxia.  She had suffered blunt force trauma injuries to her

3

face, scalp, and the back of her head. Some of the injuries had been inflicted over time, one on top of another. There was also bruising on her upper chest at the base of the neck and on the muscles in front of the neck. The internal injuries were consistent with strangulation.

Law enforcement retrieved text messages from McDonald's phone. Two messages sent by defendant to McDonald on November 14, 2017, stated he physically abused her and kept her from Gabriella, and she threatened to leave. A search of defendant's cell phone found a photograph of defendant possibly with a black eye taken on November 17, 2017.

A urine sample taken from defendant at the hospital on November 20, 2017, tested positive for marijuana metabolite, methamphetamine, and amphetamine. Defendant used or was exposed to marijuana probably within the prior 30 days, and she used or was exposed to methamphetamine within the prior four days, or up to one week if it was a binge-use situation.

### 3. Witnesses

#### a. Katerina L.

Katerina L., an acquaintance of McDonald, lived with McDonald and defendant in September and October 2017. On one occasion, she arrived home and found that Gabriella had been left alone in the apartment in her Pack and Play. McDonald and defendant returned about an hour and a half later.

Katerina did not see any domestic violence between McDonald and defendant. Although there were nights with "some yelling," she never saw injuries on either of them. Neither ever complained to her about being injured. She saw McDonald and defendant smoke methamphetamine often, but she never saw McDonald force defendant to use it.

b.    Desiree D.

Desiree D. had recently moved into the same apartment complex as defendant and McDonald. When she left for work around 7:30 a.m. November 20, 2017, she saw defendant and McDonald outside on the porch. When she tried to say hello to defendant, McDonald kept blocking Desiree's access to even see defendant. Defendant was sitting in a chair with her hands over her face. Desiree asked if everything was okay. She was told there was nothing wrong, but the situation did not seem normal. When Desiree returned from work at about 11:30 a.m., emergency personnel were at the scene.

A few days later, Desiree spoke with McDonald on the porch. He said police were accusing him of beating and choking defendant. He swore the accusations were false. Later, Desiree overheard McDonald say he "had no problem killing an innocent."

Desiree spoke with McDonald again around Thanksgiving. He was walking through the apartment complex with an axe in the back of his pants underneath his shirt. He was upset that defendant's parents had taken defendant from the apartment. He said that when she came back, she was going to get what she deserved. He also stated he was falsely being accused of killing Gabriella.

Desiree also interacted with defendant after Gabriella's death. Two days after the death, Desiree was outside on her upstairs porch, and defendant was on the bottom stairs. Defendant was laughing and smoking methamphetamine in the open with a large group of girls. Desiree asked the group to go inside, but they laughed at her. After she threatened to call the sheriff, the group went inside.

On the day of Gabriella's funeral, defendant knocked on Desiree's door and asked to speak with her. Desiree found this odd, as the two did not have a relationship and the same women who had been smoking methamphetamine with defendant earlier were sitting at the bottom of the stairs to defendant's apartment. Desiree and defendant sat outside on the porch. At one point, defendant put her head down and became incoherent,

as if going in and out of consciousness, like people Desiree had witnessed who were on heroin. Defendant was coherent enough at times to say it was not her fault that McDonald killed Gabriella, and that McDonald was abusing her as well.

When Desiree asked defendant why she did not protect Gabriella, defendant said, " 'I did not know I was supposed to.' " Then defendant said, " 'It's okay, because I'm free.' " Desiree asked if she meant free from McDonald or from the baby. Defendant replied, " 'Both. I'm glad that I don't have to have her in my life anymore.' " She said, " 'I didn't even want it to begin with.' "

B. Defense

1. Defendant

Defendant testified on her own behalf. Gabriella was born in Sacramento. Defendant and Gabriella lived with defendant's father for a time, and then they lived with defendant's grandfather in Southern California for approximately a year. Defendant met McDonald through a friend, and she and Gabriella moved in with him in September 2017 to help him pay the rent.

McDonald was controlling. He told defendant not to touch his things and to keep the kitchen clean. Defendant was not allowed to communicate with her fiancé. McDonald did not allow defendant to use the bathroom by herself. The night Katerina moved out, McDonald chained and cuffed defendant to the bed, raped her, and forced her to use drugs. McDonald told her she would not be able to see her child if she did not use methamphetamine.

McDonald locked Gabriella in the apartment's second bedroom and did not allow defendant to see her for over 20 days. If defendant walked down the hall, McDonald was with her and would not allow her to touch the closed bedroom door. Gabriella was never brought out of the bedroom to be with defendant.

6

McDonald abused defendant sexually and physically. He forced himself onto her more than once, conditioning defendant's seeing Gabriella on her meeting his sexual demands. He would grab defendant by her hair at the nape of her neck and throw her into a wall. Defendant suffered a black eye, a fat lip, broken teeth, and a dent in her skull from McDonald's abuse.

Defendant planned to leave McDonald. She asked contacts to take care of Gabriella, but they declined. She did not know how to drive McDonald's manual car and she did not have a driver's license. McDonald kept his car keys on himself at all times. Because of an "app" McDonald had on his phone, she could not call for help without first alerting McDonald. She had no money; McDonald possessed her EBT card she used to receive cash assistance from the county. McDonald hung old cell phones to use as "nanny cams" to watch the entire apartment. Prior to hanging the phones, he kept defendant cuffed and chained to the bed.

McDonald threatened defendant. He told her he would find her, kill her, rape and dismember her corpse, and spread her remains down the river so no one could find her. He also threatened to harm defendant's family and others. Defendant feared for hers and Gabriella's lives and the lives of others. She pretended to be happy and in a relationship with McDonald to keep him happy at whatever cost. McDonald would not let her out of his sight, and he told her what she could and could not say to anyone while outside the apartment.

On the morning of November 20, 2017, the day Gabriella died, McDonald woke defendant up and told her to have a cup of coffee and get into the shower. The day was going to be a good day because she would get to see Gabriella. While she was showering, McDonald ran into the bathroom and yelled that something was wrong with Gabriella. Wearing a bathrobe, defendant walked out of the bathroom, and she saw McDonald doing compressions on Gabriella. The toddler was on the dresser in her bedroom that they used as a changing table. Panicked, defendant called her father and

7

yelled, "Call 911." She touched Gabriella's foot. It was ice cold. She looked for a blanket to cover her and warm her up. Her father arrived, took Gabriella from McDonald, and began rescue breathing and CPR.

At the hospital, McDonald told defendant what to say before she met with law enforcement. She was to say that Gabriella had been crying at 3:00 a.m., and he went into her room. He woke defendant up at 3:00 a.m. to make a sandwich for Gabriella, and he found her nonresponsive. Defendant told the detectives that scenario. She did not know whether it was true. She testified that McDonald woke her up and told her Gabriella was hungry and to make her a ham sandwich. When she made the sandwich "wrong," he hit her. She did not see or hear Gabriella at 3:00 a.m.

Defendant admitted at trial that when she spoke with officers on November 20 at the hospital, she did not tell them she had been abused. She did not because she feared for her safety and her family's safety. She did not know if telling the officers would risk more injuries from McDonald.

Law enforcement interviewed defendant a third time on November 25, 2017, at defendant's request. In this interview, defendant told officers she had been abused. By this time, she was living with her father, and she felt safe enough to disclose the abuse.

### 2. Kimberly C.

Defendant's mother, Kimberly C., testified that around Halloween, 2017, she and defendant had agreed to meet at a Starbucks. Defendant had originally said that only she and McDonald would be there. Kimberly demanded they bring Gabriella.

At the Starbucks, McDonald was hovering over defendant, almost like he would not let her breathe. McDonald was "pretty much on [defendant's] lap." Something about McDonald made Kimberly feel uncomfortable. He would not allow her to have a one-on-one conversation with defendant. Kimberly felt he was very controlling. The meeting lasted only 10 minutes.

8

## C. Rebuttal

### 1. Kateri N.

On November 17, 2017, Kateri N. interviewed McDonald for a position at her place of employment. McDonald was with a woman who looked like defendant and who identified herself as "Samantha" and McDonald's girlfriend. The interview occurred behind closed doors and lasted half an hour. The business was located next to a veterinarian office and was within walking distance of restaurants and stores.

### 2. Detective Heidi Hampton

Detective Heidi Hampton participated in the interviews of defendant on November 20 and 25, 2017. She also interviewed defendant on December 1, 2017. In none of those interviews did defendant mention that McDonald had handcuffed her to the bed and raped her repeatedly.

Detective Hampton became familiar with the area surrounding McDonald's apartment. There were active, open businesses nearby, including a child-care center and a shopping center directly across the street, and an urgent care center two blocks away.

## D. Judgment and sentence

A jury found defendant guilty of felony child endangerment. (Pen. Code, § 273a, subd. (a) (section 273a(a)) [statutory section citations that follow are found in the Penal Code unless otherwise stated].) The jury also found true an enhancement that defendant willfully caused or permitted the child to be injured and the injury resulted in death. (§ 12022.95.)

The trial court imposed an aggregate prison sentence of eight years: the middle term of four years plus an additional four years for the enhancement.

DISCUSSION

A pinpoint instruction relates particular facts to a legal issue in the case or pinpoints the crux of a defendant's case. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) A trial court is required to give a pinpoint instruction upon request if there is evidence that supports the defendant's theory. (*Ibid*.) But the court may refuse to give a pinpoint instruction if the instruction incorrectly states the law, is argumentative, duplicative, or potentially confusing, or is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) Instructions that highlight specific evidence or invite the jury to draw inferences favorable to one side are considered argumentative and should not be given. (*People v. Bell* (2019) 7 Cal.5th 70, 107.)

Defendant asked the trial court to instruct the jury with the following pinpoint instruction: "Parents have a common law duty to protect their children and may be held criminally liable for failing to do so: a parent who knowingly fails to take reasonable steps to stop an attack on his or her child may be criminally liable. [¶] Parents do not have the duty to risk death or great bodily harm to protect their children, and the relative size and strength of the parties involved is relevant to a determination of what is reasonable." The instruction was based on similar language in *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1219-1220 [parent may qualify as aider and abettor of abuser, but a parent's duty to protect her children does not require parents to take unreasonable actions].)

The trial court denied defendant's request. It stated the instruction's first sentence misstated section 273a(a) and added an element of knowledge that was absent from the pattern jury instruction for section 273a(a), CALCRIM No. 821, and its misdemeanor counterpart, CALCRIM No. 823. The trial court rejected the instruction's second sentence because it misstated the law based on *Rolon*, which was an aiding and abetting case, and it overlapped with the instruction on the defense of duress the court intended to

give the jury.  Defense counsel remained free to argue that McDonald's and defendant's relative sizes impacted defendant's ability to prevent harm to her daughter, and that it would have been unreasonable for her to act if she believed she or someone else's life would have been in immediate danger.

Defendant contends the trial court erred in refusing to instruct the jury with her proposed instruction's second sentence regarding the extent of a parent's duty to protect a child and factors that may be relevant to determining whether the parent's actions were reasonable.  Defendant argues that contrary to the trial court's conclusion, the proposed instruction did not misstate the law, as it was taken from language in *Rolon, supra*, 160 Cal.App.4th at pages 1219-1220.

Defendant also claims the court incorrectly concluded that the proposed pinpoint instruction overlapped the duress instruction.  The defense theory was that McDonald's abusive behavior and the fear it instilled in defendant prevented her from caring for her child, and that under those circumstances she acted reasonably at the time.  Defendant claims the pinpoint instruction covered her defense; it focused on McDonald's behavior and the reasonableness of her behavior in light of the circumstances.  The duress instruction focused instead on defendant's fear.  Defendant contends the trial court's ruling was prejudicial error in violation of her due process rights because it prevented the jury from fully considering her defense.

Assuming for purposes of argument only that the trial court erred, we evaluate whether the error was harmless.  Defendant contends we must apply the test for federal constitutional error because the omission of the pinpoint instruction denied her the due process right to have the jury instructed on her theory of the case.  Under that test, federal constitutional error is prejudicial unless it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

We conclude the trial court's not giving the pinpoint instruction was harmless beyond a reasonable doubt.  The pinpoint instruction was duplicative.  The court

11

instructed the jury on defendant's theory of the case by instructing on the defense of duress. That instruction contained the elements defendant sought to put before the jury with her pinpoint instruction.

The court instructed the jury that defendant was not guilty of the charged offense and the enhancement if she acted under duress. The court explained that the defendant acted under duress "if, because of threat or menace, she believed that her or someone else's life would be in immediate danger if she refused a demand or request to commit the crime . . . ."

The court further instructed, "Demand or request may have been [] express or implied. The defendant's belief that her or someone else's life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in the same position as the defendant would have believed. A threat of future harm is not sufficient. The danger to life must have been immediate. [¶] The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty . . . ."

This instruction informed the jury that, as the pinpoint instruction asserted, parents do not have a duty to risk death or great bodily harm to protect their children. (See *Rolon, supra*, 160 Cal.App.4th at pp. 1219-1220.) Under the instruction, if defendant reasonably believed that because of McDonald's threats or menace she would place her or Gabriella's life in immediate danger if she acted to stop McDonald, i.e., refused McDonald's express or implied demand that she not interfere and permit his abusing Gabriella, then she acted under duress by not interfering with McDonald and was not guilty.

The duress instruction also addressed the pinpoint instruction's direction on the issue of reasonableness. When deciding whether defendant's belief was reasonable, the

12

jury was required to consider "all the circumstances as they were known to and appeared to the defendant," and consider "what a reasonable person in the same position as the defendant would have believed." There is no reasonable doubt that the jury, determining whether defendant's belief of imminent harm if she acted was reasonable, considered among numerous other factors her and McDonald's relative sizes and strengths. Defense counsel argued to the jury that the size disparity between McDonald and defendant facilitated McDonald's abuse of defendant and Gabriella and prevented defendant from escaping. The instruction and counsel's argument sufficiently informed the jury it could consider the parties' sizes and strengths when determining whether defendant's belief was reasonable.

Contrary to defendant's argument, the duress instruction did not focus on defendant's fear. It focused on the effect McDonald's actions had on the reasonableness of defendant's actions. Indeed, the instruction was triggered by the threat or menace made by McDonald against defendant, and the reasonableness of defendant's actions was to be considered in light of those circumstances, just as the pinpoint instruction sought. Where pattern instructions given to the jury adequately cover the same ground as the defendant's pinpoint instruction, "we cannot conclude defendant was denied the right to have the jury consider [her] defense theory." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1022.)

Any error by the trial court was thus harmless beyond a reasonable doubt. Because the jury was instructed on the elements of the pinpoint instruction, had the pinpoint instruction been given, there is no reasonable doubt that the jury would have still convicted defendant of felony child endangerment under section 273a(a).

Because we find no prejudicial constitutional error, we need not address whether the error was prejudicial under the *Watson*[1] standard of harmless error.

DISPOSITION

The judgment is affirmed.

 

 

 

_____

HULL, Acting P. J.

We concur:

_____

MESIWALA, J.

_____

WISEMAN, J.*

---

[1]     *People v. Watson* (1956) 46 Cal.2d 818, 836.

*  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.